**William C. GODLEY and Rodney W. Godley, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 90–3994C.

United States Claims Court.

Aug. 14, 1992.

Russell M. Robinson, II, Charlotte, N.C., attorney of record for plaintiffs. Robert C. Sink and Robinson, Bradshaw & Hinson, P.A., of counsel.

Patricia R. Davis, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Michael F. Hertz, Polly A. Dammann, and Norman Menegat and Sandra McFeeley, U.S. Postal Service, of counsel.

## OPINION

FUTEY, Judge.

This government contract case is before the court on cross-motions for summary judgment. Plaintiffs contracted with the United States Postal Service (Postal Service) for the construction and lease of a facility to serve as an annex for mail carriers in Charlotte, North Carolina ("09/10 Annex"). Defendant entered the premises of the 09/10 Annex and continues to occupy them, but refuses to tender the agreed rent. Instead, defendant pays plaintiffs at a rental rate it has unilaterally determined to be the fair market value of the premises. Plaintiffs allege breach of contract. They seek damages for the breach and compensation for changes allegedly ordered by the Postal Service. In defense, defendant avers fraud in the procurement and violations of procurement regulations, and asserts counterclaims based on plaintiffs' allegedly fraudulent actions.

### Factual Background

Plaintiffs, William C. Godley and Rodney W. Godley, each own a one-half interest in a tract of land located at 430 Minuet Lane, Charlotte, Mecklenburg County, North Carolina. When the Postal Service advertised for the lease of space in September 1988, plaintiffs offered to build a postal facility on the tract and lease it to the Postal Service. Plaintiff, William C. Godley (Godley), submitted the offer to Charles D. Paramore (Paramore), a real estate specialist with the Postal Service who was responsible for issuing the advertisement for space. Paramore's relationship with Godley dated back to 1986, when Paramore negotiated for the renovation and lease of a Godley

property located at 417 Minuet Lane, known as the Starmount Temporary Carrier Annex (Starmount Annex).

After examining the various offers submitted in response to the September 1988 advertisement, the Postal Service decided to accept Godley's proposal. In February 1989, the Postal Service and Godley executed an "Agreement to Lease" ("Agreement" or "contract"). At this time, there was not an existing building on the tract at 430 Minuet Lane.

Under the terms of the Agreement, Godley agreed to provide the "labor, materials and equipment to build out the facility in compliance with postal requirements." The facility was to be built within 6 months. The Agreement further provided that the "basic lease terms and dollars are based on rents and modifications combined at $12.446 per square foot and/or $248,920.00.00 [sic] per annum over the basic lease term. Rents are fixed at $5.00 per square foot. Should renovations exceed $50.00/s.f. this offer is void." The basic lease term was 10 years at $248,920.00 per year, payable in monthly installments of $20,743.33. The Agreement also established six options to renew the lease for 5-year periods at increasing rents and an option to purchase after the first year of the basic lease term. The duty of the Postal Service to perform was conditioned on the acceptance of the completed facility by the Postal Service contracting officer (CO). On such acceptance, the Postal Service was to prepare a formal lease and send it to Godley.

Godley's firm, Godley Construction Company, undertook the construction of the 09/10 Annex. Another corporation owned by Godley, Godley Builders, Inc., was hired as general contractor.[1] Godley retained an architectural firm, C.L. Helt Architect, Inc., to design the postal facility. After the design was completed in April 1989, Godley Builders began the grading and site work. Godley alleges that at this time, he obtained quotations from contractors and suppliers for the construction of various

parts of the postal facility. From these quotations and other data, Godley's chief estimator, William W. Dixon (Dixon), prepared a detailed estimate of the facility's cost.

Godley agreed to consider a quotation from James Gainey (Gainey) of J.I. Gainey Construction, Inc. (Gainey Construction) for the building construction work necessary for the postal facility. Godley, Dixon, and Gainey met to discuss the quotation, and, at the end of April 1989, negotiated a mutually acceptable lump sum contract. In early June 1989, Godley gave Gainey Construction notice to proceed. According to Godley, the Gainey contract was administered as a subcontract of Godley Builders.

On September 5, 1989, Paramore was indicted on one count of conspiracy, 18 U.S.C. § 371, and seventeen counts of bribery, 18 U.S.C. § 201(b). Paramore's indictment charged that he conspired with Gainey and others to commit offenses against the United States and to defraud the Postal Service. Paramore was accused of receiving seventeen bribes from Gainey totaling $73,000.00. During this time, Gainey allegedly received $2,412,276.50 for work performed on eight Postal Service contracts that Paramore was in charge of supervising. The construction projects listed in the indictment include both the Starmount Annex and the 09/10 Annex. Paramore was accused of soliciting a "$10,000.00 loan" from Gainey at the job site of the Starmount Annex in December 1986 or January 1987. The indictment further alleged that Paramore picked up his final bribe at the 09/10 Annex on August 11, 1989.

In October 1989, the Postal Service accepted, and took possession of, the 09/10 Annex. In early November 1989, the Postal Service transmitted a lease for execution by Godley. Godley returned this lease for corrections. After making the corrections, the Postal Service forwarded the lease to Godley. Godley executed the corrected lease and sent it to the Postal Service on December 5, 1989.

---

1. William C. Godley is sole shareholder and president of Godley Builders, Inc. Rodney W. Godley is the company's secretary and treasurer.

In the meantime, on November 22, 1989, Paramore pled guilty to Count 1 (conspiracy) and Counts 2, 17, and 18 (bribery). The guilty plea encompassed the August 11, 1989, bribe at the 09/10 Annex.[2] By letter dated March 27, 1990, the Postal Service informed Godley that, in light of Paramore's guilty plea, it could not agree to the terms of the lease, but offered to renegotiate the terms of the lease.

On May 17, 1990, plaintiffs submitted a properly certified claim to the CO under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–13. In their claim, plaintiffs alleged breach of contract and sought to collect the lease payments promised in the Agreement. In addition, plaintiffs requested $15,190.20 as compensation for changes to the contract.

On June 21, 1990, the Postal Service made a partial payment of rent for its use of the 09/10 Annex and stated that it would continue to pay reduced rent until plaintiffs' claim was resolved. The Postal Service further noted that its payments were made without prejudice to the rights of either party.

In November 1990, the CO finally responded to plaintiffs' CDA claim. First, the CO refused to issue a final decision on the lease payments. The CO informed plaintiffs that the contract appeared to be tainted by fraud. Accordingly, the CO had transferred the matter to the Justice Department, explaining that only the U.S. Attorney General can compromise a matter involving fraud. The CO did issue a final decision denying plaintiffs' changes claim because they had failed to submit sufficient supporting documentation for the claim.

On December 7, 1990, plaintiffs timely filed a direct access appeal from the CO's final decision under the CDA, 41 U.S.C. § 609(a)(1). In Count I of the complaint, plaintiffs allege a breach of the Agreement and seek $117,392.98 currently due and owing. This amount represents the difference between the rate set forth in the Agreement and the amount actually paid by the Postal Service. In addition, plaintiffs seek any additional amounts that may come due and owing after December 1, 1990. Plaintiffs also seek a judgment declaring the Agreement valid and binding and requiring defendant to perform under it. In Count II, plaintiffs request compensation of $15,190.20 for changes required by the Postal Service.

In its answer filed April 29, 1991, defendant asserts five affirmative defenses, a Special Plea in Fraud under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514, and nine counterclaims. The affirmative defenses are based on Paramore's conduct in accepting bribes and kickbacks from Gainey and on alleged fraud and misrepresentations by plaintiffs. The counterclaims are brought under the False Claims Act, 31 U.S.C. § 3729, the anti-fraud provision of the CDA, 41 U.S.C. § 604, and common law theories of fraud, misrepresentation, inducement of a breach of fiduciary duty, payment by mistake, and unjust enrichment. In its counterclaims, defendant focuses on plaintiffs' conduct in obtaining the Agreement and in submitting a claim for the reimbursement of *ad valorem* taxes. Defendant further denies that plaintiffs are entitled to recover for the alleged changes to the contract. In a reply dated May 28, 1991, plaintiffs deny the allegations defendant relies on as the basis for its affirmative defenses, special plea, and counterclaims.

On December 31, 1991, plaintiffs filed a motion for summary judgment on Counts I and II of the complaint and on defendant's

---

**2.** Charles C. Paramore's (Paramore) guilty plea was entered under the doctrine of *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), and is known as an "*Alford* plea." In making such a plea, the defendant agrees to plead guilty to the charges while maintaining his innocence. As a prerequisite to accepting the plea, the trial court must determine that a factual basis exists for the plea. On December 20, 1990, Paramore filed a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. In the motion, Paramore continued to protest his innocence and requested relief on the grounds that his guilty plea was unlawfully induced and not made voluntarily, and because of ineffective assistance of counsel. On June 10, 1992, Paramore's appeal was denied. *United States v. Paramore,* 966 F.2d 1445 (4th Cir.1992) (per curiam).

counterclaims and affirmative defenses. In a motion filed February 7, 1992, defendant cross-moves for summary judgment on Count I of the complaint and on those affirmative defenses based on Paramore's actions. With respect to Count II, defendant points to issues of material fact concerning the existence of the changes, the authority to order them, and their cost. Defendant further maintains that summary judgment on its fraud counterclaims and on those affirmative defenses based on plaintiffs' conduct is not viable as plaintiffs' state of mind in their dealings with the Postal Service is genuinely at issue. The parties filed further briefs in March 1992, and, upon plaintiffs' request, the court heard oral argument on June 25, 1992.

### *Summary Judgment*

■ Summary judgment is an integral part of the federal rules; it is designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (*quoting* Fed.R.Civ.P. 1). Summary judgment is appropriate when the pleadings raise no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. RUSCC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing an absence of evidence to support the non-movant's case. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party opposing summary judgment has the burden of showing sufficient evidence, not necessarily admissible, of a genuine issue of material fact in dispute. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553 (1986). Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom

the benefit of all presumptions and inferences runs. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir. 1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

To grant summary judgment in the present case, the court must determine, as a matter of law: (1) whether defendant breached the Agreement; (2) whether defendant can avoid the Agreement because of Paramore's actions; (3) whether Postal Service regulations were violated, and, if so, whether the Agreement is rendered null and void; (4) whether plaintiffs committed fraud or misrepresentations; (5) whether plaintiffs can recover for the alleged changes; and (6) whether plaintiffs are entitled to any relief.

### *Discussion*

### I.

■ The undisputed facts indicate that defendant entered and possessed the 09/10 Annex in mid-October 1989, yet refused to pay rent. These actions gave plaintiffs the right to declare the Agreement materially breached and at an end. *Airco, Inc. v. United States*, 205 Ct.Cl. 493, 497, 504 F.2d 1133, 1135 (1974). However, the undisputed facts further indicate that plaintiffs have not sought to cancel the contract. Instead, plaintiffs have elected to treat the contract as still viable and in operation. This action constitutes an election to continue the contract, and restricts plaintiffs to a claim for partial breach. *Cities Serv. Helex, Inc. v. United States*, 211 Ct.Cl. 222, 234–35, 543 F.2d 1306, 1313 (1976). As plaintiffs have fully complied with the CDA, they can maintain an action for partial breach based on defendant's failure to fulfill its contractual obligation to pay the rental rate established in the Agreement.[3] The validity of defendant's defenses is discussed below.

---

**3.** Plaintiffs also seek a declaration that the Agreement to Lease ("Agreement" or "contract") is valid and binding, and an order directing defendant to comply with the terms of the Agreement. The court lacks jurisdiction under the Tucker Act to enter declaratory relief or to require specific performance of defendant. *United States v. King*, 395 U.S. 1, 3–5, 89 S.Ct. 1501, 1502–03, 23 L.Ed.2d 52 (1969); *Hossein v. United States*, 218 Ct.Cl. 727, 728 (1978).

## II.

█ The government may avoid a contract that is tainted by fraud, kickbacks, conflicts of interest, or bribery. *United States v. ACME Process Equip. Co.*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966); *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961); *J.E.T.S., Inc. v. United States*, 838 F.2d 1196 (Fed.Cir.), *cert. denied*, 486 U.S. 1057, 108 S.Ct. 2825, 100 L.Ed.2d 926 (1988); *Joseph Morton Co. v. United States*, 757 F.2d 1273 (1985); *K & R Eng'g Co. v. United States*, 222 Ct.Cl. 340, 616 F.2d 469 (1980). This rule applies absent a criminal conviction and without a showing that the wrongdoing adversely affected the contract. *K & R Eng'g*, 222 Ct.Cl. at 351–52, 616 F.2d at 474–75. The prime contractor's innocence is not a defense. *Mississippi Valley*, 364 U.S. at 564–65, 81 S.Ct. at 316–17. The rule's broad scope is justified by the strong public interest in guaranteeing the integrity of the procurement process and in insulating the public from corruption. *ACME Process*, 385 U.S. at 144–145, 87 S.Ct. at 355; *Mississippi Valley*, 364 U.S. at 564–65, 81 S.Ct. at 316–17.

█ Where the prime contractor is innocent of wrongdoing, the government must exercise the right to avoid the contract within a reasonable time of learning that it is tainted by wrongdoing. The failure to do so results in the loss of the right of avoidance. *ACME Process Equip. Co. v. United States*, 171 Ct.Cl. 324, 336, 347 F.2d 509, 516 (1965), *rev'd on other grounds*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966); *see Pacific Architects & Eng'rs, Inc. v. United States*, 203 Ct.Cl. 499, 513, 491 F.2d 734, 742 (1974); *Restatement (Second) of Contracts* § 381(2) (1980). The right of avoidance is also lost by action that is inconsistent with avoidance. Such action constitutes an affirmance and has the effect of ratifying the contract. *Havoco of America, Ltd. v. Hilco, Inc.*, 731 F.2d 1282 (7th Cir.1984); *Restatement (Second) of Contracts* § 380(2). However, a contract that is obtained through the prime contractor's wrongful conduct is void *ab initio* and, therefore, cannot be ratified. *See J.E.T.S., Inc.*, 838 F.2d at 1200; *K & R Eng'g*, 222 Ct.Cl. at 352–56, 616 F.2d at 475–77. Similarly, wrongdoing by the prime contractor during contract performance justifies termination of the contract for default. *Joseph Morton Co.*, 757 F.2d at 1277–79.

█ In this case, defendant lost any right it may have had to avoid the contract because of kickbacks or bribes, by failing to exercise that right in a timely manner. The facts indicate that defendant knew that the contract was tainted by wrongdoing when it entered and took possession of the 09/10 Annex in mid-October 1989. On August 1, 1989, Gainey informed Tom Bryson (Bryson), Postal Service Supervisor, that he had made several payments to Paramore. Bryson, in turn, notified the United States Postal Inspection Service. Postal inspectors interviewed Gainey on August 2, 1989, and learned that Gainey had made sixteen payments to Paramore in return for obtaining construction contracts. On August 11, 1989, the inspectors arranged to witness and to record on audiotape Gainey's payment of a $5,000.00 bribe to Paramore. On that same day, the inspectors arrested Paramore about a quarter of a mile from the site where the bribe was paid and found $5,000.00 on his person. On September 5, 1989, Paramore was indicted on one count of conspiracy and seventeen counts of bribery. In the indictment, the basis for each count against Paramore was fully laid out. These events reveal that defendant knew of Paramore's conduct, and further was aware that the 09/10 Annex project was implicated in that conduct, well before defendant occupied the 09/10 Annex premises in mid-October 1989.[4]

After taking possession of the 09/10 Annex, defendant continued to act in a manner consistent with a desire to continue contract performance. Thus, defendant

---

4. At oral argument, defendant asserted that the Postal Service did not know of Paramore's fraudulent conduct when it took possession of the 09/10 Annex. Transcript of Oral Argument, pp. 37–38. The facts, however, indicate otherwise.

proceeded to submit to plaintiffs a lease for execution. However, defendant stalled when it was time to execute the lease itself, although repeatedly indicating that execution was forthcoming.[5] It was not until March 1990, roughly 8 months after defendant first learned of the improper arrangement between Paramore and Gainey, that it took any action inconsistent with the contract. In a letter dated March 27, 1990, defendant expressed its dissatisfaction with the terms of the lease it had promised to execute in the Agreement. Nonetheless, defendant continued to occupy the premises while attempting to renegotiate the lease.

On April 13, 1990, defendant responded to an inquiry from plaintiffs concerning the basis for defendant's March 1990, letter. Defendant indicated that it considered the lease void because of Paramore's wrongdoing. Nevertheless, rather than exercising its rights, defendant expressed its desire to negotiate a new lease. According to defendant, any new agreement would have "to assure that the Postal Service receives the best bargain for the project," and any offer would "be considered in relation to the competitive market that exists in the area." Plaintiffs responded in May 1990, by filing a claim for rent with the CO.

In a letter dated June 21, 1990, the CO for the Postal Service informed Godley that it had enclosed a check for $93,333.33. This amount represented payment for the 09/10 Annex from November 1, 1989 until June 30, 1990. This breaks down to a rate of $11,666.66 per month, which is $9,076.67 less than the $20,743.33 per month agreed to in the lease. The CO explained that payment was without prejudice to either party's rights and was neither an admission nor a ratification of the lease. The CO promised to render a final decision in a timely manner. Finally, the CO stated that plaintiffs would continue to receive $11,666.66 per month, pending resolution of the parties' dispute. The Postal Service has continued to pay at this rate.

In November 1990, the CO finally referred plaintiffs' claim for rent to the Justice Department. In January 1991, defendant reimbursed plaintiffs for *ad valorem* taxes levied on the leasehold, as required under the terms of the Agreement. At the present time, defendant still does not seek to avoid the contract. Instead, defendant occupies the premises at a greatly reduced rental rate, having, in effect, unilaterally reformed the parties' contract.

On these facts, defendant may not avoid the Agreement with plaintiff. Defendant took possession of the 09/10 Annex premises with knowledge of the illegality involved in its procurement. After taking possession, defendant delayed almost 6 months before indicating that it would not honor the Agreement. During that period, defendant acted without any indication that it sought to avoid the contract. On informing plaintiffs that it would not execute the lease as promised, defendant did not vacate the premises, but continued to enjoy the benefits of its agreement with plaintiffs without paying any rent. In June 1990, defendant finally agreed to pay rent, but only at a rate it had unilaterally determined was fair market value.[6] Defendant continues to occupy the 09/10 Annex and pay the diminished rental rate.

Defendant's conduct amounts to undue delay and is inconsistent with contract avoidance. Indeed, defendant's actions in taking possession of the 09/10 Annex with knowledge of Paramore's wrongdoing and in occupying the 09/10 Annex for almost another 6 months without any indication

---

5. In her deposition testimony, Martina C. Pierce (Pierce), Manager, Real Estate Branch, Greensboro Facilities System Office (FSO), indicated that she was responsible for deciding whether to sign the lease for the 09/10 Annex, but hesitated in doing so because of Charles Paramore's arrest and the taint of his conduct on the Agreement. Pierce further indicated that she was aware of Paramore's arrest at the time the Postal Service occupied the building. Appendix to Defendant's Proposed Findings of Uncontroverted Facts and Statement of Genuine Issues, Tab 23 at 41–42, 68–71.

6. The reservation of rights in the June 21, 1990, letter was insufficient to preserve the right to avoid the Agreement. *Cf. Cities Serv. Helex v. United States*, 211 Ct.Cl. 222, 238–40, 543 F.2d 1306, 1315–16 (1976).

that it sought to avoid the contract, constitutes an affirmance of the contract. In short, defendant had the opportunity to cancel the contract. However, the time in which to disaffirm the contract has long since passed. Accordingly, defendant can no longer maintain an action to avoid the contract.[7]

## III.

■ The government may cancel a contract awarded in violation of procurement statutes and regulations. *Schoenbrod v. United States*, 187 Ct.Cl. 627, 634–35, 410 F.2d 400, 403–04 (1969). Where the illegality is plain and palpable, the contract is void *ab initio*, and recovery under the contract is prohibited. *Id.; Prestex Inc. v. United States*, 162 Ct.Cl. 620, 626–28, 320 F.2d 367, 372–73 (1963). Conversely, departures from applicable statutes and regulations that are not "palpably illegal to the bidder's eye" render the contract voidable, not void. *Trilon Educ. Corp. v. United States*, 217 Ct.Cl. 266, 273, 276–77, 578 F.2d 1356, 1360, 1362 (1978).

■ In determining whether an award is palpably illegal, courts seek to protect innocent contractors. *United States v. Amdahl Corp.*, 786 F.2d 387, 395 (Fed.Cir. 1986). Contractors know little about the complex procurement statutes and regulations and should not suffer for every deviation from them. *Trilon Educ. Corp.*, 217 Ct.Cl. at 273, 578 F.2d at 1360. As a result, a contractor is penalized for a violation of a statute or regulation only when the contractor's actions or statements invited the illegal award, or when the illegality itself was so obviously contrary to statute or regulation that the contractor should have recognized it. *Amdahl Corp.*, 786 F.2d at 395 (*quoting Dairy Sales Corp.*, No. B–176393, 52 Comp.Gen. 215, 218 (1972) (citations omitted)). When the ques-

tion of illegality is close, the contractor should be accorded the benefit of all reasonable doubts, and the contract award upheld unless clearly invalid. *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 386, 325 F.2d 438, 440 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964).

■ In this case, defendant claims that Paramore and plaintiffs violated numerous Postal Service regulations governing the proper procedures for conducting procurement.[8] Defendant asserts that over a 2–year period beginning in 1986, Paramore provided plaintiffs information and assistance which was prohibited by the regulations. Defendant contends that these violations render the contract void and, therefore, plaintiffs cannot recover under the contract.

In support of its contention, defendant points to various violations that occurred in procuring the renovation and lease of the Starmount Annex in November 1986. Defendant asserts that Paramore violated ¶ 18–507 of the Postal Contracting Manual (PCM) by disclosing an internal construction cost estimate to plaintiffs that they used in bidding on the Starmount Annex.[9] Defendant avers that plaintiffs falsely certified that they had not paid a contingent fee in violation of PCM ¶ 1–500.

Defendant also points to numerous violations that occurred after the Postal Service contracted for the renovation and lease of the Starmount Annex but before the receipt of any bids for the 09/10 Annex. Thus, defendant claims that Paramore told plaintiffs about the 09/10 Annex project before it was advertised. According to defendant, Paramore identified potential sites for plaintiffs, visited the sites with plaintiffs, and suggested how much the Postal Service was willing to spend on the particular sites. Defendant further asserts that

---

7. As is discussed in Section IV, *infra*, there is no evidence that plaintiffs engaged in any illegal conduct relating to the 09/10 Annex project.

8. These regulations have the force and effect of law. 39 C.F.R. § 601.100; *DeMatteo Constr. Co. v. United States*, 220 Ct.Cl. 579, 591, 600 F.2d 1384, 1391 (1979).

9. The Postal Contracting Manual (PCM) was in effect until August 1, 1988, when it was replaced by the Procurement Manual (PM). 39 C.F.R. § 601.101.

Paramore helped plaintiffs formulate their offer to the Postal Service, disclosing Postal Service cost estimates, special requirements, and the amount of an acceptable rental rate. Paramore's conduct, defendant maintains, violated PCM ¶¶ 2–207, 2–209, 18–407.2, 18–507, and ¶ 4.1.2(k) of the Procurement Manual (PM).

Finally, defendant indicates that Paramore violated the regulations governing the disclosure of information after the receipt of bids. Thus, defendant alleges that Paramore identified other bidders, the properties offered, and the cost of the properties. Plaintiffs allegedly used this information and even performed site exploration work on one of the identified properties. In addition, defendant maintains that plaintiffs and Paramore discussed plaintiffs purchasing other bidders properties and offering them to the Postal Service. These actions, defendant contends, violated PCM ¶¶ 2–207, 2–209, 18–407.2, 18–507, and PM ¶ 4.1.2(k).[10]

Whether the actions of Paramore cited by defendant warrant declaring the Agreement null and void cannot be determined in a vacuum. This determination must be made against the factual background of the particular procurement. *Albano Cleaners, Inc. v. United States,* 197 Ct.Cl. 450, 455–56, 455 F.2d 556, 559 (1972). Evaluated in context, with all reasonable doubts construed in plaintiffs' favor, any illegalities that arose from Paramore's dealings with plaintiffs were neither plain nor palpable. Therefore, the court should refrain from imposing "the binding stamp of nullity." *John Reiner & Co.,* 163 Ct.Cl. at 386, 325 F.2d at 440.

As of September 1988, the Postal Service had been looking for a site suitable for a carrier annex for over 3 years. During this period, it had issued two advertise-ments for sites, but had received no acceptable offers. In the mean time, the population of the surrounding area had increased rapidly with the corresponding demands on the Postal Service growing proportionally. According to Don Peterson, Postmaster, Charlotte, North Carolina, the conditions had created safety hazards, congestion, mail on the floor, and other problems. Postal Service Decision Analysis Reports prepared in 1988 indicate that mail carriers were exposed to hazardous traffic conditions. In fact, an internal Postal Service memorandum dated April 22, 1988, indicated that the Postal Service's needs were so acute that it did not have enough time to execute the normal procurement procedures.[11] It is against this backdrop indicating the Postal Service's longstanding, urgent need for a carrier facility that Paramore's actions in attempting to obtain that facility for the Postal Service must be evaluated.

In light of the factual background, the Postal Service regulations cited by defendant did not plainly prohibit Paramore's actions. In the section setting forth general policies, the regulations indicate that all purchasing shall be made on a competitive basis, but only where "feasible" or "practicable." PCM ¶ 1–300.1; PM ¶ 1.7.1. The regulations applicable to the leasing of facilities further indicate that departures from formal purchasing methods are permitted and that many of the procedures required for general purchases do not apply to leases of facilities. PCM ¶¶ 18–401, 18–407; PM ¶ 11.4.1. Accordingly, the Postal Service had in place a separate set of procedures governing the procurement of leases of facilities. These procedures were set forth in general terms with the emphasis on the need for flexibility in procedures. PCM ¶¶ 18–400–18–410.3; PM

---

**10.** Defendant avers that during the negotiations surrounding the Starmount Annex, Paramore informed plaintiffs that he was "on the take," and that near the end of the construction of the 09/10 Annex, Paramore solicited money from plaintiffs. According to defendant, plaintiffs violated PM ¶ 1.7.8 by failing to report Paramore's actions to the Postal Inspection Service. However, the duty to report information concerning gratuities is directed at Postal Service employ-ees, not contractors. Moreover, the contractor's failure to report such information would not render a contract void. *Cf. Trilon Educ. Corp. v. United States,* 217 Ct.Cl. 266, 275–76, 578 F.2d 1356, 1361 (1978).

**11.** Appendix to Defendant's Proposed Findings of Uncontroverted Facts and Statement of Genuine Issues, Tab 21.

¶ 11.4.1–11.4.3. Thus, the Postal Service was afforded great discretion in the pertinent regulations. The existence of this broad grant of discretion, coupled with the apparent need for the exercise of that discretion at the time plaintiffs were dealing with Paramore, supports plaintiffs' belief that Paramore's actions were legal.

Paramore's actions also did not clearly fall within any regulatory bar. Defendant cites PCM ¶¶ 2–207, 2–209, 18–407.2, 18–507, and PM ¶ 4.1.2(k) as barring Paramore's conduct.[12] However, only ¶ 18–407.2 applies to the procurement of leases of facilities. The other paragraphs apply to general procurement, or the procurement of construction (PCM ¶ 18–507), and are not clearly applicable to leasehold procurement. *See* PCM ¶¶ 18–401, 18–407, 18–501; PM ¶¶ 11.4.1, 11.4.3, 11.5.1. While ¶ 18–407.2 applies to the leasing of facilities, it does not apply to the instant case. This regulation applies only when a solicitation is outstanding or negotiations following the receipt of offers are being conducted. In this case, the relevant solicitation occurred in September 1988. At that time, the PCM was no longer in effect, but had been replaced by the PM, which did not have any prohibition comparable to that contained in ¶ 18–407.2. *See* 39 C.F.R. § 601.101; PM ¶¶ 11.4.1–11.4.3.

In any event, ¶ 18–407.2 does not clearly prohibit Paramore's actions. The regulation specifically forbids the Postal Service from giving one offeror "the names of other offerors, the rental rates offered by others or a rental rate which must be met in order for an offer to be considered acceptable." In this case, the alleged misconduct took place between late 1986 and early 1989. During this time, the Postal Service issued only two advertisements for sites that were subject to ¶ 18–407.2. Plaintiffs did not submit a bid in response to either of these advertisements and, thus, cannot be considered an offeror within the meaning of ¶ 18.407.2. Plaintiffs did submit an offer in February 1988. This offer, however, was not submitted in response to a solicitation from the Postal Service, and negotiations under ¶ 18.407.2 did not ensue. In short, Paramore's actions were not plainly and palpably illegal.[13]

Assuming *arguendo* that Postal Service regulations prohibited Paramore's actions, the violations would be insufficient to void the contract. First, plaintiffs did not induce an illegal award by their conduct. *See Prestex Inc.*, 162 Ct.Cl. 620, 320 F.2d 367; *Johnson v. United States*, 15 Cl.Ct. 169 (1988). Although the Agreement indicates that plaintiffs intended to renovate and lease existing space, plaintiffs did not include this representation in their offer of September 1988, but instead indicated that they would construct a new facility. Nor was plaintiffs' offer non-responsive and, therefore, void. While the cover letter to the advertisement for space indicated that the solicitation was for existing space, the advertisement stated that "[o]fferors may offer either existing space, space to be modified, or *facilities to be constructed.*" [Emphasis added.] The advertisement contained no contrary indication. Moreover, the regulations indicate that facilities not yet built, but offered in response to solicitations for existing space, are to be treated as existing space. PM ¶ 11.4.3. From these regulations, an inference can be drawn that facilities to be constructed are included in the definition of "existing space" for purposes of soliciting offers to lease existing space.

In addition, the violations cited by defendant are qualitatively different from those violations that have caused a contract to be

---

**12.** Defendant also indicates that plaintiffs violated PCM ¶ 1–500. Paragraph 1–500 requires a contractor to reveal whether it has paid a contingent fee to obtain a contract from the Postal Service. This regulation was allegedly violated when plaintiffs entered into the Agreement to Lease the Starmount Temporary Carrier Annex. Thus, the violation is inapplicable to this case and does not justify the voiding of the instant contract.

**13.** Assuming that a prohibition against conduct like Paramore's is implicit in the very notion of fair competition, such a prohibition would not render the contract void. *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 386–89, 325 F.2d 438, 440–42 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964).

void on the grounds that " 'the contractor was on direct notice that the procedures being followed were violative of [statutory or regulatory] requirements.' " *Amdahl Corp.*, 786 F.2d at 395 (*quoting Dairy Sales Corp.*, No. B–176393, 52 Comp.Gen. 215, 218 (1972) (citation omitted)). Such direct notice has been found where the contracting agency completely omits a step during procurement that is clearly required by statute or regulation, or where the contract by its terms is illegal.[14] In this case, all steps required by statute or regulation have been taken, and the contract terms are legal. Paramore's allegedly illegal actions impact on the way the Postal Service conducted the instant procurement, but do not in any way constitute the failure to fulfill a statutory or regulatory mandate.

In *Trilon Educ. Corp.*, the court found that the violation of a regulation did not warrant the voiding of the contract, explaining:

> Granted that this * * * [procedure] was clearly prohibited by the procurement regulations, and for good and sufficient policy reasons, the fact that a procurement practice is prohibited does not necessarily mean that it is therefore actionable. The discipline to be administered in such cases is a responsibility of the cognizant procurement officials within the agency in which the violation took place. It is not a type of discipline to be administered by this court * * *.

217 Ct.Cl. at 276, 578 F.2d at 1361 (*quoting E. Walters & Co. v. United States*, 217 Ct.Cl. 254, 263–64, 576 F.2d 362, 367 (1978)). The court further noted that certain violations are matters for "internal resolution" and do "not rise to such a level of impropriety as to require us to punish the other party." *Id.*

In this case, the problem of controlling employees, like Paramore, is a matter for internal resolution by the Postal Service. In the meantime, however, the contractor should not be punished for the Postal Service's self-created problems of administration and control of its employees, while the Postal Service, operating under loosely drawn regulations, is free to engage in any conduct suited to its needs, safe in the knowledge that a court will later invalidate any unfortunate contract it enters into. In short, plaintiffs cannot be penalized for defendant's indiscretions.

## IV.

The Forfeiture of Fraudulent Claims Act requires "any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance" of a claim, to forfeit that claim to the United States. 28 U.S.C. § 2514. Under the False Claims Act, on establishing the knowing submission of a false or fraudulent claim, the government may recover a money judgment against the person presenting the claim. 31 U.S.C. § 3729. To similar effect is the anti-fraud provision of the CDA. 41 U.S.C. § 604. Pursuant to 28 U.S.C. §§ 1503 and 2508, the United States Claims Court has jurisdiction over government counterclaims asserted under these acts. *Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 542 (Fed.Cir.1988).

Defendant alleges that any claim submitted by plaintiffs falls within the reach of the above statutes. Defendant avers that plaintiffs obtained the Agreement by knowingly misrepresenting the nature and costs of the 09/10 Annex. Therefore, any claim asserted by plaintiffs has its basis in fraud and must be forfeited. Defendant further avers that the fraud practiced by plaintiffs renders them liable for a money judgment. Accordingly, defendant brings counter-

---

**14.** *See Urban Data Sys., Inc. v. United States*, 699 F.2d 1147 (Fed.Cir.1983) (illegal cost-plus-a-percentage-of-cost contract); *Yosemite Park & Curry Co. v. United States*, 217 Ct.Cl. 360, 582 F.2d 552 (1978) (illegal federal income tax reimbursement provision); *Schoenbrod v. United States*, 187 Ct.Cl. 627, 410 F.2d 400 (failure to consider price in awarding contract); *New York Mail & News. Transp. Co. v. United States*, 139 Ct.Cl. 751, 154 F.Supp. 271, *cert. denied*, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957) (failure to advertise); *Ocean Technology, Inc. v. United States*, 19 Cl.Ct. 288 (1990) (failure to advertise); *Colorado State Bank of Walsh v. United States*, 18 Cl.Ct. 611 (1989), *aff'd mem.*, 904 F.2d 45 (Fed.Cir.1990) (failure to obtain appraisal and other information).

claims for fraud. Finally, defendant asserts plaintiffs' fraud as the basis for various affirmative defenses to the Agreement. *See J.E.T.S., Inc.*, 838 F.2d at 1200; *K & R Eng'g*, 222 Ct.Cl. at 352–56, 616 F.2d at 475–77.

Defendant has failed to provide proof sufficient to avoid summary judgment in favor of plaintiffs on the issue of fraud. Defendant has supplied evidence that plaintiffs and Paramore reformulated plaintiffs' bid in terms of rental rates for a "shell" and "renovations." According to defendant, this breakdown of plaintiffs' bid constituted a misrepresentation as it suggested that plaintiffs were offering to renovate an existing building (shell) and lease it to the Postal Service. Defendant also maintains that plaintiffs misrepresented their estimated costs. Defendant avers that these misrepresentations place plaintiffs' state of mind genuinely at issue.

 While plaintiffs may have developed shell and renovation rental rates with Paramore, they never submitted them to the Postal Service as part of their bid. Plaintiffs' offer was for the construction of a new facility and its lease to the Postal Service. Similarly, defendant's allegations that plaintiffs misrepresented their estimated costs are without merit. In their offer, plaintiffs never gave any representation as to their costs, but simply set forth yearly rental rates and a lump sum offer to purchase applicable at the end of the first 12 months.[15] Accordingly, the Postal Service could not have relied on the alleged fraudulent breakdown or costs estimate to its detriment. Thus, an action for fraud is precluded. *Colorado State Bank of Walsh*, 18 Cl.Ct. at 629. Nor did plaintiffs submit any false information to the Postal

Service. Absent such a submission, the False Claims Act is inapplicable. *See* 31 U.S.C. § 3729(a)(2); *cf. United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir.1991).

 Defendant also points to the Agreement as misrepresenting the nature of the 09/10 Annex. That document indicates that "[t]he basic lease terms and dollars are based on rents and modifications.... Rents are fixed at $5.00 per square foot. Should renovations exceed $50.00/s.f. this offer is void." Defendant maintains that plaintiffs signed the contract knowing that no building existed to be renovated and that the Agreement had to be approved by the CO. According to defendant, plaintiffs' actions amounted to a misrepresentation and, as such, generate a genuine issue of material fact as to plaintiffs' state of mind in signing the Agreement.

Although the above language could be interpreted as technically misrepresenting the nature of plaintiffs' offer, the evidence cited does not indicate that plaintiffs agreed to the language in order to obtain the contract with the government. Plaintiffs never misrepresented the nature of their offer before Paramore included the above language in the Agreement. Plaintiffs' offer dated September 27, 1988, renewed its offer of February 8, 1988, in which plaintiffs proposed to construct a new facility. As far as plaintiffs were concerned, the Postal Service had accepted the September 27, 1988, offer before the Agreement was executed.[16] Plaintiffs understood the Agreement to be the contract itself, not an offer inviting an acceptance. To plaintiffs, the CO's approval of the Agreement was only a formality.[17] Thus,

---

**15.** Defendant asserts that, under the Agreement, plaintiffs received an excessive return on their investment and that this is indicative of fraud. Defendant has supplied various appraisals of the value of the 09/10 Annex and evidence that the 09/10 Annex was poorly constructed. Plaintiffs have produced evidence to the contrary. Assuming that defendant can prove that plaintiffs received a higher than normal return on their investment, this fact does not indicate fraud by plaintiffs.

**16.** The evidence supplied by the parties indicates that final approval of plaintiffs' offer occurred in December 1988. Decision Analysis Report, Appendix to Defendant's Proposed Findings of Uncontroverted Facts and Statement of Genuine Issues, Tab 50.

**17.** Frank W. Womack (Womack), Manager, Real Estate Branch, Greensboro FSO, was the CO for the Postal Service when the Agreement was executed. In his deposition testimony, Womack testified that he signed off on agreements to lease that seemed reasonable based on

the evidence cited does not show that plaintiffs misrepresented the nature of the proposed site "to get" the contract with the Postal Service. *See* 31 U.S.C. § 3729(a)(2). Accordingly, any claim asserted under the contract did not have its genesis in fraud or misrepresentation, as is required for the application of the above acts. *See* 28 U.S.C. § 2514; 31 U.S.C. § 3729(a)(1); 41 U.S.C. § 604; *Brunswick Bank & Trust Co. v. United States,* 707 F.2d 1355, 1364–65 (Fed.Cir.1983); *Brown Constr. Trades, Inc. v. United States,* 23 Cl.Ct. 214, 216 (1991).

Contrary to defendant's assertions, the circumstances surrounding the inclusion of the above language in the Agreement do not give rise to an inference of fraud. Instead, these circumstances are fully consistent with plaintiffs' innocence. First, the Agreement was drafted by Paramore, and plaintiffs assert that they relied on Paramore's explanation that the above language was included for internal processing purposes. Under the circumstances, this explanation was plausible. Plaintiffs were not experienced government contractors and were not familiar with the Postal Service's internal procedures. Plaintiffs, however, did know of the Postal Service's difficulties in obtaining a suitable facility and its longstanding, urgent need for such. As a result, reliance on Paramore's explanation was reasonable as the need to expedite processing was evident.

In addition, plaintiffs submitted their offer of new construction in response to a solicitation for "existing space, space to be modified, or facilities to be constructed." They were further aware that the Postal Service had reviewed a variety of different properties over the past year. The Postal Service is afforded great flexibility in comparing different properties. *See* PM ¶ 11.-4.1. Thus, it was reasonable to believe that the contract language included by Paramore was carried over from the evaluation process and necessary for internal processing. Conversely, no evidence has been cited indicating that plaintiffs had any knowledge that the information contained in the above language might be misleading to the CO. Nor is there any indication that the above language was submitted with the intent to defraud. Thus, the circumstances at issue do not indicate the "knowing" submission of "false" information or the intent to defraud within the meaning of the above acts.

Plaintiffs also assert that they believed that the Postal Service knew that the proposed site was empty. The evidence cited lends credence to plaintiffs' assertion. The proposed site was located directly across from the Starmount Annex. In addition, plaintiffs' offer of September 1988, was clearly for the construction and lease of a new facility. Moreover, the Decision Analysis Report approving the release of funds to plaintiffs for the renovation and lease of existing space had been prepared and approved by Postal Service employees who knew the site offered by plaintiffs was empty.[18] On these facts, there is no reason to doubt plaintiffs' assertion that they believed that the Postal Service knew that the proposed site contained no existing building to renovate. Plaintiffs' belief negates any inference of fraud on their part. Plaintiffs simply had no motive to misrepresent the nature of the proposed site.[19]

---

information supplied by the real estate specialist without conducting an independent review of that information. Womack further testified that when it was time to execute an agreement to lease, he had previously done any necessary review. Therefore, Womack would sign the agreement to lease without further review. Appendix to Defendant's Proposed Findings of Uncontroverted Facts and Statement of Genuine Issues, Tab 43 at 59, 61–62.

**18.** *See* Appendix to Defendant's Proposed Findings of Uncontroverted Facts and Statement of Genuine Issues, Tab 50 (Decision Analysis Report); Tab 45 at 28–32 (Deposition of Don W.

Peterson, Postmaster, Charlotte, North Carolina); Tab 47 at 39–40 (Deposition of Johnny L. Miller, Financial Analyst Senior, Greensboro FSO).

**19.** Defendant has also supplied extensive proof that in awarding the contract to plaintiffs, the Postal Service relied on Paramore, not any representations by plaintiffs. Thus, reliance, an essential element of fraud, is lacking in this case. *See Colorado State Bank of Walsh v. United States,* 18 Cl.Ct. 611, 629 (1989), *aff'd mem.,* 904 F.2d 45 (Fed.Cir.1990).

Defendant attempts to erect the inference of a conspiracy involving Paramore and plaintiffs from the intimacy of their dealings. Defendant asserts that where issues of motive or intent are central, summary judgment is usually inappropriate. *See Poller v. Columbia Broadcasting Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

■ The court is not unmindful of the difficulties associated with supplying evidence of intent. However, to avoid summary judgment, defendant must produce evidence sufficient for a reasonable jury to return a verdict in defendant's favor. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. Such evidence is lacking. The substance of defendant's proof is derived from the alleged improprieties that occurred between Paramore and plaintiffs. From this allegedly illegal conduct, defendant would have the court draw an inference of fraud and a conspiracy to defraud. In section III, *supra,* the undisputed actions of Paramore and plaintiffs were evaluated in the light most favorable to defendant and determined to be within the bounds of law. In his various statements, Gainey has not implicated plaintiffs in any fraud or conspiracy. Postal inspectors have investigated plaintiffs for fraud, and defendant has conducted discovery, yet no concrete evidence of fraud has been cited. The evidence cited by defendant as proof of fraudulent misrepresentation has been examined and found to be fully consistent with plaintiffs' innocence. Accordingly, plaintiffs' motion for summary judgment on the issue of fraud in obtaining the Agreement must be granted.

■ In addition to alleging fraud in obtaining the contract, defendant avers that plaintiffs submitted a false claim for the reimbursement of taxes. Under the contract, the Postal Service was required to reimburse plaintiffs for *ad valorem* taxes levied on the 09/10 Annex. Accordingly, plaintiffs submitted a claim for $16,739.00 in January 1991. The claim included amounts attributable to the whole 4.78 acre

property at 430 Minuet Lane. The Postal Service, however, was obligated to reimburse plaintiffs only for taxes attributable to the 3.67 acres leased to it. Thus, in their claim, plaintiffs included taxes attributable to 1.11 acres not leased to the Postal Service. These taxes totaled $770.00. In an interview with postal inspectors on February 25, 1991, Godley insisted that the Postal Service should pay the additional taxes, since he had to buy the whole parcel. On April 29, 1991, defendant filed its answer asserting three counterclaims associated with the $770.00 payment. These counterclaims are based on theories of fraud under the False Claims Act, unjust enrichment, and payment by mistake. In May 1991, plaintiffs reimbursed defendant for the $770.00 incorrectly paid to plaintiffs.[20]

To avoid summary judgment on its counterclaim under the False Claims Act, defendant must provide proof that plaintiffs submitted the instant claim with the knowledge that it contained false information, in deliberate ignorance of the truth or falsity of such information, or in reckless disregard of the truth or falsity of such information. 31 U.S.C. § 3729(b); *Sterling Millwrights, Inc. v. United States,* 26 Cl. Ct. 49, 96 (1992). Defendant maintains that there is a genuine issue of fact as to whether plaintiffs knowingly submitted a false claim for reimbursement of the $770.00. Defendant avers that plaintiffs knew that the tax bill would include the whole 4.78 acres and that the Postal Service was occupying only part of the tract. Defendant further alleges that plaintiffs understood that the Postal Service was responsible only for the taxes attributable to the property actually leased. Since plaintiffs possessed this knowledge at the time the claim was submitted, defendant reasons, an inference arises that plaintiffs knowingly included the $770.00 in their claim. Plaintiffs counter that the $770.00 was included by mistake.

Assuming defendant is correct that plaintiffs knew that the Postal Service was not

---

**20.** As plaintiffs have returned the $770.00, the counterclaims for unjust enrichment and pay-

ment by mistake have been rendered moot.

responsible for reimbursing taxes attributable to the 1.11 acres, there is still no evidence indicating that plaintiffs knowingly submitted a false claim. Instead, the evidence indicates negligence by plaintiffs. Negligence is not actionable under the False Claims Act. *United States v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991).

The evidence shows that in submitting the claim, plaintiffs failed to review their records, the terms of the Agreement, or otherwise refresh their memory. This omission may have amounted to negligence, but does not create a genuine issue of fact as to plaintiffs' state of mind. The $770.00 was a small percentage of the whole bill, and the evidence cited is consistent with plaintiffs innocently overlooking its inclusion in their claim, especially since plaintiffs owned and paid taxes on many other properties. Defendant has produced no evidence indicating that, at the time the claim was submitted, plaintiffs knew that the claim contained amounts not owed by defendant. Nor has any other evidence been cited calling plaintiffs' explanation into question.

Godley's insistence in February 1991 that the Postal Service reimburse him for the entire tract is not, in itself, indicative of fraud. Godley's statements were made after the fact of submission and in a confrontational setting with postal inspectors who were attempting to discern whether Godley was involved in fraud with Paramore. Evaluated in context, Godley's statement is insufficient to create a genuine issue of fact as to his earlier state of mind when submitting the instant claim to the Postal Service.

In short, there is no evidence that plaintiffs included the $770.00 in their claim with an intent to defraud or otherwise knew, at the time of submission, that the claim included improper amounts. The circumstantial evidence relied on by defendant is too inconclusive to give rise to a genuine issue of material fact. Therefore, plaintiffs' motion for summary judgment on defendant's counterclaim for submitting a false claim for $770.00 is granted.[21]

## V.

 To recover under the changes clause for a constructive change to the contract, a contractor must show that a government officer having the requisite authority ordered the performance of work beyond that required by the contract.[22] *Calfon Constr. Co. v. United States*, 18 Cl.Ct. 426, 434 (1989), *aff'd mem.*, 923 F.2d 872 (Fed.Cir.1990). A representative of the CO can bind the government, but only when acting within the scope of the authority delegated by the CO. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). In addition, "[a]uthority to bind the [g]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee." *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed.Cir.1989) (*quoting* J. Cibinic, Jr. & R. Nash, Jr., *Formation of Government Contracts* 43 (1982)). A contractor is precluded from recovering for a constructive change if it was responsible for causing the additional work required by the government. *See General Dynamics Corp. v. United States*, 218 Ct.Cl. 40, 56, 585 F.2d 457, 466 (1978).

Plaintiffs seek $15,190.20 under the changes clause as compensation for alleged additional work. Plaintiffs assert that Peterson revised the plans prepared by their architect. According to plaintiffs, these revisions caused them to perform work beyond that required by the contract.

---

**21.** Defendant has cited no evidence indicating that plaintiffs took any actions to induce Paramore to breach the fiduciary duties he owed the Postal Service. Therefore, plaintiffs are granted summary judgment on defendant's counterclaim for inducement of a breach of fiduciary duty.

**22.** For purposes of this motion only, the court will assume, as the parties do in their pleadings, that the Agreement was subject to a changes clause. That contract, however, neither contained a changes clause nor incorporated such by reference. Moreover, neither party cited a Postal Service regulation mandating the application of a changes clause to the instant contract.

Summary judgment on this issue is inappropriate as there are genuine issues of material fact. First, whether Peterson possessed actual or implied authority to order the alleged changes is genuinely at issue. The evidence cited indicates that he had some role in administering the contract. Implicit in such a role is the authority to carry out the duties assigned. The exact nature of Peterson's role in contract administration and the extent of his authority are genuinely at issue.

In addition, whether plaintiffs were responsible for causing the additional work is in dispute. The Agreement required plaintiffs to obtain approval of the drawings from the CO before beginning construction. Defendant has supplied evidence that the CO never approved the drawings as required under the contract. According to defendant, the alleged changes would not have resulted in additional work if plaintiffs had submitted the drawings to the CO before they commenced construction. Plaintiffs counter that the drawings were approved by the CO's representatives. At issue is whether the CO approved the drawings through his representatives, and, if not, whether plaintiffs' failure to obtain such approval caused the need for any additional work.

Finally, the parties dispute whether the alleged changed work resulted in additional costs. Defendant points to the lack of documentation of costs, while plaintiffs counter with an invoice from Gainey Construction listing the costs. In addition, defendant has supplied evidence indicating that plaintiffs included an amount in their offer to cover the costs of any changes under the contract. Plaintiffs question whether this evidence is pertinent. These issues, and the other issues set forth above, would benefit from further ventilation of facts. Accordingly, plaintiffs' motion for summary judgment must be denied. *See Philadelphia Suburban Corp. v. United States*, 217 Ct.Cl. 705, 707 (1978).

### VI.

As relief for defendant's partial breach, plaintiffs are entitled to the difference between the full contract rental rate and the rental rate actually paid by defendant. This difference has been established to be $9,076.67 per month. Thus, in accordance with the terms of the Agreement, plaintiffs are entitled to $9,076.67 per month from the first day of the month following acceptance of the 09/10 Annex by the CO until the date that judgment is entered in this case. In addition, plaintiffs are entitled to interest pursuant to 41 U.S.C. § 611.

### Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment on Count I of the complaint, and on defendant's affirmative defenses and counterclaims, is granted. Defendant's cross-motion on Count I is denied.

With respect to Count II of the complaint, plaintiffs' motion for summary judgment is denied. Accordingly, the parties are directed to consult and then file a joint status report concerning further proceedings in this case by September 14, 1992.

As there is no just reason for the delay of entry of judgment on Count I, the parties are directed to file, by September 14, 1992, a joint stipulation as to the amount due plaintiffs pursuant to the court's holding on Count I. At the time the joint stipulation is filed, the Clerk is directed to enter judgment for plaintiffs without further order by the court.