HAWAIIAN BITUMULS & PAVING, a DIVISION OF DILLINGHAM CONSTRUCTION PACIFIC, LTD., a Hawaii corporation, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 90–739C.

United States Claims Court.

Sept. 22, 1992.

Bert T. Kobayashi, Honolulu, Hawaii, for plaintiff.

Robert E. Kirshman, Jr., Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on the parties' cross-motions for summary judgment.

For the reasons set forth below, the court grants in part, and denies in part, defendant's motion; and grants in part, and denies in part, plaintiff's cross-motion.

### FACTS

In September 1982, Hawaiian Bitumuls & Paving contracted with the United States Department of the Navy to repair aircraft parking aprons and taxiways at the Naval Air Station at Barbers Point, Hawaii (NASBP). A significant part of the repair work was the cleaning and resealing of joints in the concrete pavement of the NASBP airfield.[1] Additionally, all cracks and spalls in the pavement were to be repaired.[2] Section 02616, Part 3, of the contract outlined the preparation and resealing of the joints, and is, in substantial part, as follows:

3.1.1 Preparation of Joints: The existing joint sealing materials and foreign matter in pavement joints shall be removed to the depth required to accommodate any separating or depth blocking medium used to maintain the required depth for the new sealing materials to be installed.... All residual joint sealing material existing on the pavement shall be removed completely by scraping, wire-brushing or power driven concrete sawing with diamond or abrasive blades to expose clean concrete....

3.1.2 Preparation of Cracks: Enlarge cracks to the width and depth indicated on the drawings by means of a power driven concrete saw with diamond or abrasive blades, random-crack grinder, or a vertical bit router capable of following the path of the crack and of widening the top to the required section without causing excessive spalling or other damage to the concrete. Immediately following the enlarging operation, the faces and opening shall be thoroughly cleaned with a high pressure water jet to remove all cuttings or debris remaining on the faces or in the opening.

    ....

3.1.4 Cleaning of Joints and Cracks: Following removal of existing sealing materials and reshaping of joints and cracks and immediately before installation of new joint filler and sealant, the joints and cracks shall be thoroughly cleaned until all laitance, curing compound, existing preformed joint filler, and protrusions of hardened concrete are removed from the sides and upper edges of the groove to be sealed. The exposed concrete joint faces and the pavement surfaces extending about 1 inch from the edges of joints and cracks shall then be sandblasted, using a multiple-pass technique with properly positioned and directed nozzles until the surfaces are free of dust, dirt, curing compound, preformed joint filler, old sealant, and any other material that might prevent bonding of the new sealant to the concrete.... A minimum of 150 cubic feet per minute of air at a nozzle pressure of 90 pounds per square inch shall be used for sandblasting and for final cleaning of the joints and cracks immediately prior to the application of the sealant.

3.1.5 Air Blowing: After cleaning by sandblasting, all dust, sand, water and other foreign matter in the joints and cracks shall be blown out with compressed air....

3.2 INSTALLATION OF JOINT FILLER: Joint filler material shall be of the sizes that will fit tightly in the joint and cracks and shall be installed with the top elevation as detailed on the drawings. Joint filler material shall be installed when the bottom of the opening to be resealed is formed by previously installed sealant, or if the groove or opening is of greater depth than indicated on the drawings, or as specified elsewhere. The

---

1. The NASBP airfield is composed of concrete slabs which must be sealed together "to prevent the intrusion of water into the substr[ate]." Water can either cause the substrate to lose its "capacity to bear load," or take away uniform support from the overlying slab which eventually creates a cavern in the unsupported area.

The joint sealant must possess rubber-like qualities which allow it to expand and contract with the concrete slabs and still maintain an effective seal.

2. Spalls are chips or splinters in the concrete that occur around the edges of the slabs.

groove or opening shall be plugged or sealed to prevent entrance of the sealant below the designed depth. The joint filler shall not be stretched during insertion.

. . . .

## 3.4 APPLICATION OF JOINT SEALANT:

. . . .

3.4.2 Restrictions: No sealing material shall be applied over wet surfaces. Concrete surfaces shall be surface dry and all joints and cracks shall be filled to the depths indicated or specified.... The sealing work shall progress in the direction and prevailing wind so that dust resulting from the air blowing operation will not be carried back into the clean joints and cracks. No sealing work shall be started until the new concrete has cured. When rains interrupt installing operations, joints and cracks shall be recleaned prior to installation. Joint sealant shall not be installed using gravity methods and pouring pots.

3.4.3 Joint and Crack Sealing ... The joints or cracks shall be filled in one pass from bottom up to such a height that after cooling or curing of the sealant, the top of the sealant will be ¼ inch below the pavement surface. All excess sealant shall be removed from the pavement by approved methods without damaging the pavement surface and discarded.... All joint sealant shall be applied in a steady flow, filling all voids and cracks, leaving a smooth and level surface.

Under Federal Specification SS–S–200D, two types of sealants could be used to secure airfield joints: Type M, a machine-mixed, fast-cure sealant; and Type H, a hand-mixed, retarded-cure sealant. The detailed conditions for their use are as follows:

3.4.1 *Type M sealant (fast curing).* Type M sealant shall conform to the following requirements and conditions:

(a) Sealant shall be formulated for application with pressurized mixing and extruding equipment specified by model number to the contracting formulator....

(b) Mixing ratio shall be by volume, one part component A to one part component B plus or minus 5 percent variation.

(c) The viscosity of each component A and component B shall be not greater than 2,000 poises....[3]

(d) Working life of the homogeneous mixture of the sealant shall be formulated for such time duration (working life) at conditions ... to allow the use of the specified equipment to mix and extrude the material and to seal a prepared concrete joint with performance properties as specified herein.

(e) Tack-free time for the sealant at standard conditions shall be not greater than 3 hours after application....

3.4.2 *Type H sealant (retarded cure).* Type H sealant shall conform to the following requirements, at standard conditions:

(a) The sealant shall be formulated for manual mixing and pouring or extruding application. One component of the sealant may be supplied in dry particle form.

(b) Mixing ratio component A to component B shall be supplied in preproportioned containers.

(c) The viscosity of component A or component B shall be not greater than 1500 poises at standard conditions, except when one component is powder,

---

**3.** A poise is defined as:
The C.G.S. [centimeter-gram-second] unit of absolute viscosity, being the absolute viscosity of a fluid that would require a shearing force of one dyne to move a square-centimeter area of either of two parallel layers of the fluid, one centimeter apart, with a velocity of one centimeter per second relative to the other layer, the space between the layers being filled with the fluid.

Webster's New International Dictionary 1905 (2d ed. 1957).
A dyne is "[t]he unit of force in the C.G.S. system of physical units. It is such a force that under its influence a body whose mass is one gram would experience an acceleration of one centimeter per second per second."

the liquid component shall not exceed 500 poises....

(d) The working life of the homogeneous mixture of sealant shall be not less than 1 hour after mixing at standard conditions specified herein.

(e) The tack-free time for the sealant shall be not greater than 12 hours after application....

Fed.Spec. SS–S–200D also specified, in section 3.2.1, that the curing agent used in either type of sealant was to be "a blend of plasticizers, curing agents, accelerators, gelling agents (thixotrope), and fillers complimenting [the base resin]." Section 3.2.2, stated that the base resin was to be "a homogeneous mixture of polymer and filler with the option of added activators, plasticizers, gelling agents (thixotrope), pigments, and inert extenders in a system complimenting [the curing agent]."

Although Fed.Spec. SS–S–200D authorizes the use of either type of sealant, the NASBP contract specifically required the use of a Type M joint sealant. Plaintiff had planned to use Vulkem 205, a Type M sealant manufactured by Mameco, International, but was persuaded by its subcontractor, J & G Enterprises, Ltd., that Vulkem 202, a Type H sealant also by Mameco, was better for the job. Mr. John Stallman, president of J & G, had heard of problems with Vulkem 205 on previous jobs and contacted Mameco to discuss the possible use of Vulkem 202. Mameco stated that the Vulkem 202 was preferred "for ease of application, easier handling, and a much lower cost and easier to operate mixing machine." Though the "cured physical properties of the [Vulkem 202] and [Vulkem 205] are identical," the tack-free time of the Vulkem 202 is nine hours longer than the Vulkem 205.[4] Mr. Stallman was assured by Mameco that Vulkem 202 met the requirements of Fed.Spec. SS–S–200D.

Being convinced that Vulkem 202 was better suited for the job at NASBP, plaintiff sought a modification to the contract. After a series of meetings and letters, defendant, on August 1, 1983, issued Modification P00002 which stated that:

The contractor shall substitute Vulkem 202, SS–S–200D Type H, joint and crack sealant in lieu of SS–S–200D Type M. Sealant will have a manufacture date no earlier than 11 months prior to placememt [sic] in joint. The warranty period for the sealant shall be 3 years in lieu of 1 year as stated in Clause 62 of the General Provisions.

In addition to providing an expanded warranty, plaintiff was also required to adjust the formula of the Vulkem 202 to achieve an eight-hour tack-free time.

J & G began preparing the joints to be re-sealed but encountered joints in section 5A of the airfield that varied significantly from the contract drawings. The joints were wider than depicted in the drawings, and 70 to 80 percent "were 'V' or irregular 'U' shaped" instead of being square. Because of the shape of the joints in section 5A, J & G was unable to strip the joints of 100 percent of the old sealant without "extensive saw-cutting and cleaning ... which would have meant a significant increase in labor and material costs." Instead, it tested two joint sections to determine whether the Vulkem 202 would vulcanize the old sealant and adhere to the joint walls. The tests were successful and plaintiff met with Lt. Richard L. Katz, USN, an assistant to the Resident Officer in Charge of Construction (ROICC), to secure an agreement from defendant that the joints be cleaned of only 80 percent of the old sealant. Lt. Katz orally agreed to the 80–percent figure, but no modification was ever issued to officially incorporate the change into the contract.[5]

---

4. Tack-free time is the time needed for a sealant to no longer be "tacky" on the surface. Cure time is the time needed for "full depth cure." The tack-free time of Vulkem 202 is twelve hours; the tack-free time of Vulkem 205 is three hours.

5. Lt. Katz testified in his deposition that he did not "recall ... agreeing to modify the contract

to reduce cleaning requirements to a lower percentage than ... 100 percent." In his affidavit, John Stallman stated that the 80–percent agreement between plaintiff and Lt. Katz was contained in Modification P00007; however, Mod. P00007 dealt only with the increased cost of preparing and resealing joints and cracks that

J & G began sealing the joints on June 15, 1983. Within weeks, however, the sealant began to fail, becoming hard and cracked. Cracks were noticed between the joint walls and the sealant (adhesive failure), and in the sealant itself (cohesive failure). The Navy rejected the work and ordered plaintiff to replace the failed sealant. Although defendant alleged that J & G "did not take any corrective action" after the sealant failure, plaintiff stated that it complied with defendant's order to replace the sealant, but that the sealant again failed. In December 1986, plaintiff hired Hunt Contracting who successfully resealed the joints in approximately seven months. Final inspection and acceptance by defendant took place on July 7, 1987, and plaintiff was charged for 741 days of delay at $335.00 per day.

To recover its additional costs in resealing the airfield joints, and the liquidated damages assessed against it, plaintiff filed suit in this court on August 8, 1990. The complaint alleged defective design specifications, breach of implied warranty, deficient plans, wrongful acts and omissions in contract administration, and constructive change to the contract; it also sought an equitable adjustment, declaratory relief, and an extension of time.[6]

## DISCUSSION

Summary judgment is appropriate when "there is no genuine issue as to any material fact" so that the moving party "is entitled to judgment as a matter of law." RUSCC 56(c) (1991). In evaluating a motion for summary judgment, any doubt as to whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). A genuine issue of material fact is one that would change the outcome of the litigation.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Chevron U.S.A., Inc. v. United States*, 17 Cl.Ct. 537, 540 (1989), *rev'd on other grounds*, 923 F.2d 830 (Fed. Cir.1991).

When the moving party has carried its burden, the non-moving party must come forward with specific facts showing that a genuine issue for trial exists, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), and the non-moving party may not discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir.1975). "[When] the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

Defendant moved for summary judgment on the basis that the contract specifications were performance specifications and that, accordingly, no implied warranty of adequacy existed. Even if an implied warranty of adequacy did exist, defendant argued that it was vitiated by plaintiff's proposal to modify the contract. Alternatively, plaintiff cross-moved for summary judgment, arguing that the contract contained defective design specifications, thus creating an implied warranty that if it followed the specifications, the resulting product would conform to defendant's expectations. Because the issue of whether the contract contained performance or design specifications is solely a question of law, the court will address that question first. *See United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

---

were wider than depicted on the contract drawings.

**6.** Part of plaintiff's complaint specifically addressed airfield joints that were wider than depicted in the contract drawings. However, plaintiff and the Navy settled these claims, resulting in three separate contract modifications. In its cross-motion for summary judgment, plaintiff dropped its claim of deficient plans based on wider-than-depicted joints, and its request for declaratory relief.

## I. The Nature of the Specifications.

■ According to the classic formulation defining design and performance specifications, design specifications "set forth in precise detail the materials to be employed and the manner in which the work [is] to be performed," from which the contractor is "not privileged to deviate ..., but [is] required to follow ... as one would a road map. In contrast, typical 'performance' type specifications set forth an objective or standard to be achieved ...," requiring the contractor to exercise its ingenuity in achieving the standard of performance, in selecting the means, and in assuming a corresponding responsibility for that selection. *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 412 F.2d 1360, 1362 (1969). "Detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced." *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed.Cir.1987) (citing *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918)). In contrast, the government does not impliedly warrant the adequacy of performance specifications. *Stuyvesant*, 834 F.2d at 1582.

■ Government contracts often contain both design and performance specifications. *Utility Contractors, Inc. v. United States*, 8 Cl.Ct. 42, 50 n. 7 (1985). The application of a *Spearin* implied warranty of adequacy is appropriate when the particular contract specification in question most properly can be characterized as a design specification. *R.E.D.M. Corp. v. United States*, 192 Ct.Cl. 891, 428 F.2d 1304 (1970); *Penguin Indus. v. United States*, 209 Ct. Cl. 121, 530 F.2d 934, 937 (1976). If the government breaches its implied warranty of adequate specifications, it is responsible for plaintiff's extra costs in performing under the defective specifications. *Austin Co. v. United States*, 161 Ct.Cl. 76, 81, 314 F.2d 518, *cert. denied*, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963). However, when defendant has provided design specifications and drawings, and plaintiff persuades defendant to change them in favor of plaintiff's preferred specification, plaintiff assumes the risk that performance under its proposed specifications may be impossible. In general, the party originating the design specifications is responsible for losses suffered by the other party due to defects in the specifications. *See Austin*, 161 Ct.Cl. at 81, 314 F.2d 518. Here, two specifications are at issue: the provisions in the contract for the cleaning, preparing, and resealing of the airfield joints, and Fed.Spec. SS–S–200D which controlled the mixture and application of the sealant.

■ Section 02616, Part 3, of the contract tightly circumscribed plaintiff's freedom to choose the means by which the contract was to be completed. *See Haehn Management Co. v. United States*, 15 Cl. Ct. 50, 56 (1988). For each phase of the resealing job, Part 3 specifically enumerated a series of steps that plaintiff was directed to follow. Although plaintiff was allowed to use its discretion in some of the minor details of the job, Part 3 acted as a "road map" which guided plaintiff in all of the significant portions of the repair work. *J.L. Simmons Co.*, 412 F.2d at 1362; *Aleutian Constructors v. United States*, 24 Cl.Ct. 372, 378–81 (1991). *Haehn*, held that "detailed measurements, tolerances, and materials, *i.e.*, elaborate instructions as how to perform the contract, are of a design nature, in contrast to operational characteristics and specifications that leave the details of how to comply with the contract up to the contractor." *Haehn*, 15 Cl.Ct. at 56–57 (citing *Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853, 860, *aff'd*, 834 F.2d 1576, 1582 (Fed.Cir.1987)). Since Section 02616, Part 3, was predominately of the design type, the court finds that it was indeed a design specification. *Sterling Millwrights, Inc. v. United States*, 26 Cl. Ct. 49, 84–88 (1992); *cf. Penguin*, 530 F.2d at 937; *Aleutian*, 24 Cl.Ct. at 378–81.

■ Similarly, Fed.Spec. SS–S–200D limited plaintiff's choice of sealants to use on the project. Although two types of sealant, Type H and Type M, were authorized for use under Fed.Spec. SS–S–200D, plaintiff was obligated to conform to detailed conditions for their use. The specification established conditions for mixing ratios,

viscosity, working life, and tack-free time. Additionally it set detailed requirements for the composition of the curing agent and base resin. No details were left to plaintiff to determine how to comply with the specification; all it had to do was follow the elaborate instructions on how to perform the contract. *See Johns–Manville, Corp. v. United States,* 13 Cl.Ct. 72, 131 (1987). The court has no difficulty in finding that Fed.Spec. SS–S–200D is a design specification. The court also notes that it has previously determined Fed.Spec. SS–S–200D to be a design specification. *Haehn,* 15 Cl.Ct. at 56–58.

■ Since both Section 02616, Part 3, and Fed.Spec. SS–S–200D were design specifications, the government impliedly warranted that the specifications were adequate to task of repairing the NASBP aircraft parking aprons and taxiways. *United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *Stuyvesant,* 834 F.2d at 1582. Defendant argued, however, that the implied warranty of adequacy was vitiated by plaintiff's request to substitute Vulkem 202 for the Type H sealant originally specified in the contract. The court does not agree.

For a contractor to vitiate a design specification's implied warranty of adequacy, it must participate in the drafting and development of that specification, "absent superior knowledge on the part of the Government." *Haehn,* 15 Cl.Ct. at 56 (citing *Bethlehem Corp. v. United States,* 199 Ct. Cl. 247, 462 F.2d 1400, 1404 (1972)); *see J.L. Simmons Co.,* 412 F.2d at 1363. Here, plaintiff did not participate in any way in the drafting of Fed.Spec. SS–S–200D. The government drafted the specification and set forth the conditions for the use of Type M and Type H sealants. In requesting the substitution of Vulkem 202 for the original Type M sealant, plaintiff simply sought the substitution of one government-developed specification for another. Defendant, citing *Austin, Bethlehem,* and *Aleutian,* asserted that this limited participation by plaintiff was enough to vitiate the implied warranty. However,

these cases do not support defendant's position.

In *Austin,* the United States Court of Claims found that a manufacturer was not entitled to recover expenses which were attributed to its unsuccessful attempt to produce a "Digital Data Recording and Transcribing System" for the government. *Austin,* 161 Ct.Cl. at 78–80, 314 F.2d 518. Plaintiff in *Austin* had determined that the system desired by defendant "could not be manufactured with the required precision set forth in the [government's] specifications," and created its own specifications. *Id.* at 78, 314 F.2d 518. Though the revised design was to have corrected the technical problems of the system, and to have increased the accuracy of the devise, it never worked.

In *Bethlehem,* a contractor sought to produce an environmental test chamber to perform within specific, designated limits. The government described the "type of chamber and performance requirements desired," and Bethlehem Corporation assured the government that the test chamber was feasible within a certain range. *Bethlehem,* 462 F.2d at 1401–02. Based on Bethlehem's representations as "a leading expert in environmental chamber manufacture," the government prepared its specifications. *Id.* Bethlehem built the test chamber according to the government's specifications, but the chamber never met the desired performance requirements. The court found that no implied warranty of adequacy existed in the government's specifications because of Bethlehem's involvement in the development of the specification. *See Id.* at 1404. Furthermore, the government did not possess superior knowledge of the inadequacy of its design since Bethlehem was much more knowledgeable about environmental chambers, and the government was relying on Bethlehem's expertise to develop its specifications.

Finally, in *Aleutian,* the contractor was required to design a roof system capable of withstanding an 80 p.s.f. wind uplift requirement. The government did not give instructions as to how to comply with the

wind uplift requirement and Aleutian built the roof according to its own design. The roof subsequently failed in winds well below the 80 p.s.f. requirement. This court found that the 80 p.s.f. wind uplift requirement was a performance specification, and that Aleutian was responsible for its own design.

The present case is distinguishable from *Austin, Bethlehem,* and *Aleutian* because plaintiff did not create its own specification, or assist in developing any contract specification. Though plaintiff did request that a Type H sealant be used to fulfill the contract instead of a Type M, this request did not change the fact that both types of sealant had to conform to the specifications designed by defendant. The government approved the use of Vulkem 202 as an "SS–S–200D Type H" sealant, and plaintiff's limited involvement in requesting incorporation of that government specification into the contract cannot vitiate defendant's implied warranty of adequacy as to that specification.[7]

## II. The Cause of The Sealant Failure.

■ Defendant argued that the failure of the joint sealant was due to plaintiff's noncompliance with the contract provisions governing the cleaning of joint walls. Section 02616, Part 3.1.1, stated that "[a]ll residual joint sealing material existing on the [joint walls] shall be removed completely ... to expose clean concrete." An ordinary and reasonable interpretation of "remove completely" in this context would be to remove virtually all of the joint-sealing material. "In construing a contract, the language of the instrument is given its ordinary and commonly accepted meaning unless it is shown that the parties intended otherwise." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 976 (1965). Plaintiff asserted that this condition was modified by an oral agreement with Lt. Katz, an assistant of the ROICC, which reduced the cleaning requirement to 80 percent. In his deposition, Lt. Katz did not recall agreeing to a reduction in the

cleaning requirement and, even had he made such an agreement, an oral modification would not be binding upon defendant. Provision 69, "ORAL MODIFICATION," of the General Provisions of the contract unequivocally stated that "[n]o oral statement of any person whomsoever shall in any manner or degree modify or otherwise affect the terms of this contract." Accordingly, plaintiff was required to remove 100 percent of the residual sealant before resealing the joints.

Plaintiff further argued that defendant inspected and accepted joints that were only 80 percent free of residual sealant, thus by its actions defendant allegedly ratified the modification. The contract, however, made clear in Provision 10 that government inspections or tests did not imply acceptance, nor did they relieve plaintiff of its responsibility to ensure that the work was performed pursuant to the contract. Moreover, plaintiff's argument presupposed that the cause of the sealant failure was substantially attributable to the existence of residual sealant on the joint walls—a conclusion which the court is not prepared to accept.

Stanley S. Shimabukuro, a civil engineer, theorized that "most of the failures in the sealant were due to inadequate surface preparation," but he was unable to determine the "[c]ause of cracks in the sealant located in the middle of joint [*sic*]." Mr. Shimabukuro, however, performed no laboratory tests and his opinion was based solely upon his physical observation of the joints. Another report, prepared by Erlin, Hime Associates, an engineering firm hired by plaintiff, indicated that the failures were caused by a combination of "actual joint geometry," "degradation of the sealant due to weathering," high internal shrinkage, and greater than expected joint movement. In a "few localized areas," residue from the old sealant contributed to failure of the new sealant.

7. Since the court has determined that the actions of plaintiff did not vitiate defendant's implied warranty of adequacy of the specifications, the question of whether the government possessed superior knowledge need not be addressed.

If the sealant failures were due to plaintiff's inadequate preparation of the joints, the question arises as to how far plaintiff deviated from the contract. Plaintiff stated that in all areas of the NASBP airfield other than 5A, "the joints were saw-cut and cleaned according to the contract specifications and field directives issued by the Navy." But, J & G stated in a memorandum to plaintiff that J & G had cleaned the joints "on a factor of 80%." Presumably, this statement could be taken to mean that all joints in the airfield were only 80 percent clean at the end of the preparation stage. Since the Vulkem 202 failed in nearly every section of the airfield, both adhesively and cohesively, the degree of plaintiff's compliance becomes an important factual issue.

Furthermore, the sealant failures may have been caused by the inadequate use of backer rod or joint filler.[8] Plaintiff stated that a bond breaker was not required by the contract in section 5A of the airfield, nor would joint filler work in the unusual shape of the joints. However, the Erlin, Hime Associates report indicated that a bond breaker was not used in sections other than section 5A. The degree to which a bond breaker was used on the airfield joints could be a significant factor in determining the true cause of the sealant failure.

## CONCLUSION

The specifications dealing with the preparation of the airfield joints and Fed.Spec. SS–S–200D are design specifications which defendant impliedly warranted to be adequate. Plaintiff's request that defendant modify the contract to allow the use of Vulkem 202, a Type H sealant, did not vitiate the implied warranty because plaintiff did not participate in the drafting of Fed.Spec. SS–S–200D. The actual cause of the sealant failure is presently unknown, and genuine issues of material fact remain

which must be determined at trial. The court accordingly grants in part, and denies in part, defendant's motion for summary judgment; and grants in part, and denies in part, plaintiff's cross-motion.

IT IS SO ORDERED.

---

**8.** Backer rod and joint filler are placed at the bottom of the joint before new sealant is applied and act as bond breakers to prevent three-sided adhesion. As a joint expands and contracts, the sealant must remain flexible to remain viable. If the sealant bonds to the bottom of the joint as

well as the sides, the sealant will become immobile and fail.

