**ROBIN INDUSTRIES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1307C.**

United States Court of Federal Claims.

Aug. 16, 1993.

Mark O'Neill, Cleveland, OH, for plaintiff. Andrew J. McLandrich and Cecil Marlow, of counsel.

Mark D. Rubino, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, and James M. Kinsella, Washington, DC, for defendant. Thomas Dougherty, of counsel.

*OPINION*

BRUGGINK, *Judge.*

Plaintiff contends that defendant accepted a value engineering change proposal on its government contract, then refused to share the resulting savings. Defendant has filed a motion to dismiss pursuant to RCFC 12(b)(1) for lack of jurisdiction or, in the alternative, for summary judgment under RCFC 56. The parties have briefed the matter, and oral argument is deemed unnecessary. For the reasons that follow, the court concludes that it has jurisdiction over at least part of the claim, but that defendant is entitled to summary judgment.

I. BACKGROUND [1]

The Defense Industrial Supply Center ("DISC") is part of the Defense Logistics Agency, which procures military spare parts. On February 10, 1987, DISC awarded Robin Industries ("Robin") contract number DLA500–87–C–1414 ("the contract") for 125,000 gaskets, at a unit price of $0.406 per gasket. The gaskets were for use in the Army's standard five gallon gas can. The contract included the standard value engineering clause then in use, 48 C.F.R. § 52.248–1 (1984).[2]

---

**1.** Except where drawn from the complaint, this background is drawn exclusively from the undisputed facts.

**2.** On March 15, 1987, DISC ordered 30,000 additional gaskets under contract number DLA500–87–MZ884 at the same price. Inasmuch as this second contract contains no value engineering change clause, the court considers contract

number DLA500–87–MZ884 to have been included in the complaint to support other claims previously dismissed. *See Robin Indus. v. United States,* No. 91–1307C (Cl.Ct.Dec. 20, 1991) (Order dismissing counts II, III, and IV). To the extent that plaintiff contends the value engineering clause of contract number DLA500–87–C–1414 may have been applicable to contract

Specification No. MIL–G–432F, Type III, contained requirements for the gaskets. In particular, the gaskets had to withstand certain flexibility maneuvers down to −65°F. The specifications measured flexibility with a parameter called the Torsional Modulus Ratio ("TMR"), and required that the TMR not exceed 10 when tested down to −65°F. To ensure compliance with these requirements, the specification suggested making the gaskets from a certain compound. This compound is a very expensive space-age polymer, costing about $120 per pound. Gaskets manufactured of this polymer would cost more than eight dollars each. Plaintiff contends that at the time the government awarded this contract, the sole supplier of the expensive polymer was Ethyl Corporation. Robin had never made Type III gaskets before, and its personnel were unfamiliar with the strict requirements. They assumed Robin could use a much less expensive substitute compound and still satisfy the specifications.

The Army testing labs at Natick, Massachusetts, ("Natick") are responsible for maintaining these specifications. On March 31, 1987, Ethyl contacted Natick to warn it that Robin might not be able to comply with contract specifications. The next month, personnel from Ethyl and Natick met to discuss the matter. Natick conveyed its concerns to DISC on June 19, 1987.

On July 7, 1987, DISC opened bids on another gaskets contract. James High, a Contracting Officer ("CO") at DISC, told Robin that its prices were very much out of line with other bids. Robin had bid $0.406; the other bids ranged from $7.50 to $11.50.

By August, personnel at Robin had begun to realize that producing a substitute material would be more difficult than expected. On August 13, 1987, Robin sought permission to withdraw its bid on the contract opened in July. It also advised DISC that it would be filing a request for deviation ("RFD") and a value engineering change proposal ("VECP") on the contract awarded in February. The agency permitted Robin to withdraw its bid on the July contract.

On September 21, 1987, Robin submitted a request for an extension of time or waiver of performance. Robin renewed this request on October 1, 1987. On October 20, 1987, a CO at DISC issued a show cause order threatening to terminate Robin for default. Then, on October 23, 1987, Robin submitted a "Value Engineering Change Proposal and/or Request for Deviation." This proposal consisted of a single document, which proposed a VECP or, if the government did not accept that, an RFD. There was no specific request for sharing of cost savings on existing contracts. As to future procurements, Robin suggested that for each gasket the government would realize savings of $7.00 to $8.00 over the more expensive compound. On October 26, Robin's RFD and VECP were routed to the DISC technical staff.

Robin had developed, and proposed to use for these gaskets, a new material later referred to as SPEC 8704. It would cost about $2.00 per pound. The proposed substitute would not meet all the requirements of specification number MIL–G–432F, Type III, however, so Robin also proposed changes to the specification, including a less demanding TMR requirement. This change would also have permitted Robin's material to qualify for use on future contracts. Robin proposed raising the maximum acceptable TMR from 10 to 50 on gaskets tested to −65°F.

On November 30, 1987, DISC awarded a one million dollar contract for 127,000 gasoline can gaskets to another supplier. On December 10, a general at DISC learned of the one million dollar contract and stopped work on it. In a memorandum, he suggested classifying gaskets under two different National Stock Numbers ("NSN's") based on whether the army would use them in arctic conditions. A similar idea had surfaced at Natick as early as January 5, 1987, when Eugene Wilusz, Chief of Materials and Polymers at Natick, had proposed creating two such classes of gaskets.

number DLA500–87–MZ884, the discussion below is dispositive.

In December, Natick was evaluating Robin's proposal, as well as sample gaskets made of the new SPEC 8704 material. On December 7, 1987, DISC extended Robin's time for performance under the contract to June 15, 1988, by contract modification P00002. The next week, on December 16, Natick reported to Marianne Dormer, DISC's contract administrator, that Robin's samples were acceptable. On December 24, Natick told DISC that they were planning to change the specifications to allow for two classes of gaskets, and that Robin's samples would be acceptable for the specification that only required use down to −40°F.

In January, Natick issued its amended gasket specifications. These specifications divided Type III gaskets into two classes: one for normal use, and one for use in arctic conditions. Type III class 1 gaskets for use down to −40°F retained the old stock number, NSN 5330–00–298–7165. Type III class 2 gaskets for arctic use to −60°F were given the new number NSN 5330–01–271–7621. The new specification did not track Robin's VECP. Specifically, the change did not raise the maximum acceptable TMR. Any relaxation in the TMR requirement was a side effect of only requiring class 1 gaskets to be usable to −40°F.

Natick completed its evaluation of Robin's gaskets and, on April 7, 1988, informed DISC that the gaskets would be acceptable for Type III, class 1. On April 13, 1988, a CO at DISC sent a mailgram to Robin that explicitly referred to Robin's "deviation request" but did not mention Robin's VECP. The mailgram said, "Be advised that the material Robin Industries submitted to Natick for testing has been found acceptable for these two orders only." The mailgram concludes with the line, "This message signed by Joseph Kelly, Contracting Officer." As a mailgram, this missive bears no handwritten signature as such.

Robin responded with a letter dated April 28, 1988, and addressed to Marianne Dormer of DISC. The letter, which did not specifically refer to Robin's VECP, stated:

The most important part of our proposal has to be addressed before we will proceed with these contracts.

That is we want unqualified approval as to the material properties of the compound we have proposed and Natick has tested and found acceptable.

. . . .

Although we would think it proper for DISC to pay for the increased cost of material and processing, which would bring the cost of the gasket to $.667/Ea., we would proceed with production on receipt of the unqualified approval at a rate of 5,000 gaskets per week starting thirty (30) days from approval.

On May 13, 1988, DISC sent Robin another mailgram referring to Robin's April letter but again not mentioning the VECP. This mailgram said, "Be advised Robin Industries [sic] offer of spec 8704 which was evaluated and accepted by Natick is acceptable and meets the requirements of NSN 5330–00–298–7165." This is the same NSN used for Type III class 1 gaskets which need only perform to −40°F, and used in the February 10, 1987, contract to denote unclassified Type III gaskets.

On May 23, 1988, Robin received a third mailgram from DISC, stating, "Referenced Value Engineering Change Proposal for above referenced contract was submitted to our Value Engineering Program Office and is still under review." Both the May 13 and the May 23 mailgrams state that they are "signed by J. Kelly, Contracting Officer."

The June 1988 completion date passed without Robin delivering the gaskets. In August, with Robin in breach, the parties engaged in discussions that the government contends are settlement negotiations. On August 12, DISC personnel held a meeting to decide what to do about Robin's contract, including the VECP. On August 23, 1988, a CO at DISC, Susie W. Bundy, mailed Robin an unsigned document entitled "Amendment of Solicitation/Modification of Contract," under a cover letter that states:

2. Enclosed are three copies of a Proposed Supplemental Agreement which have not been signed on behalf of the government.

. . . .

4. The formal contract modification will become effective only when your copy is mailed or otherwise furnished to you, signed on behalf of the Government by the Contracting Officer after your execution thereof. . . . You are not authorized to proceed with the contract as changed until receipt of the fully executed document.

Accompanying this letter was a proposal for a contract modification. The modification proposed that the government would accept the VECP, but contained several other terms as well. The other terms included the following: (1) that the government would accept the contractor's RFD; (2) that acceptance of the VECP would be at a no-cost settlement, under which the contractor would keep its savings on the instant contract and the government would keep the savings on any later contracts; (3) that the unit price would remain at $0.406; (4) that the contractor would deliver 5,000 gaskets per week starting September 30, 1988; and (5) that Robin would thereby unconditionally waive "any claims arising out of or related to the processing and/or acceptance or its request for deviation and its VECP." On or about August 29, 1988, plaintiff informed the government that it considered the proposed modification unacceptable.

In its complaint, Robin references two other statements by DISC. An attorney advisor for DISC, in a letter to Robin dated October 3, 1988, suggested different terms for a contract modification. Plaintiff's complaint also alleges that in a meeting between plaintiff's counsel and DISC's in-house counsel on or about October 14, 1988, DISC advanced another proposal, later delivered to plaintiff in writing. Both of these modifications, inter alia, would have raised the contract price from forty cents per gasket to sixty-eight cents per gasket. Robin did not accept either of these proposed modifications.

More than a year later, in December 1989, Robin tendered the gaskets. The CO found them to be nonconforming in dimensional requirements, but accepted them with an adjustment. The CO issued a modification accepting the RFD.[3] On July 24, 1990, Robin submitted its certified claim to the CO.[4] The CO denied that claim in a final decision on May 9, 1991. On July 23, 1991, plaintiff filed the complaint commencing this action. On December 20, 1991, the court dismissed counts II, III and IV of the complaint, leaving only count I. This remaining count is the subject of the instant motion.

## II. DISCUSSION

### A. Jurisdiction

Citing *A.A.I. Corp. v. United States*, 22 Cl.Ct. 541 (1991), defendant moves for dismissal pursuant to RCFC 12(b)(1) on the grounds that Robin's claim is a request for a declaratory judgment over which this court has no jurisdiction. The plaintiff in that case sought recovery of future contract savings, resulting from the government's alleged acceptance of a VECP on 48,000 units of anticipated production and 14,000 units already delivered. *A.A.I.*, 22 Cl.Ct. at 541. The court held that it had jurisdiction over the claim for the 14,000 units already produced, but that any ruling on the 48,000 units of anticipated production would be a declaratory judgment. *Id.* at 546. The court concluded that it had no jurisdiction over that part of

---

3. Although the modification form is dated February 10, 1987, it was not signed until May 1989. In permitting plaintiff to use its proposed substitute material, the modification adopted for the instant contract the specifications plaintiff proposed, including the numerically higher, less stringent TMR requirement.

4. Robin had previously demanded relief from the CO in a letter of January 26, 1989. On April 7, 1989, the CO replied with a letter denying the demand. Robin filed a complaint disputing the CO's decision on March 29, 1990. That action was dismissed for failure of Robin to properly certify its claim to the CO. *Robin Indus. v. United States*, 22 Cl.Ct. 448 (1991).

the claim requesting a declaratory judgment. *Id.*

Plaintiff's complaint requests money to which it claims an entitlement under the standard value engineering clause of the Federal Acquisition Regulations. Under that clause, a contractor whose VECP the government accepts shares future contract savings with the government. The clause defines "future contract savings" as "the product of the future unit cost reduction multiplied by the number of future contract units scheduled for delivery during the sharing period." 48 C.F.R. § 52.248–1(b) (1984). The sharing period begins with the acceptance of the first unit incorporating the VECP and lasts for three years. *Id.*

According to the complaint, plaintiff tendered conforming units and defendant accepted them on or about December 22, 1989. The three year statutory sharing period would therefore have expired on or about December 22, 1992. Plaintiff commenced this action July 23, 1991. At least with respect to any articles delivered in the 19 months of the sharing period that elapsed before plaintiff filed the complaint, this court does have jurisdiction even as the court in *A.A.I.* asserted jurisdiction over the 14,000 articles already produced. These are not claims *in futuro*, but claims for a fixed amount, determinable with further discovery. At a minimum, the court thus has jurisdiction over part of plaintiff's claim.

▇ Defendant also contends that the court may not review the CO's decision to reject the VECP, because the regulations state, "The Contracting Officer's decision to accept or reject all or part of any VECP and the decision as to which of the sharing rates applies shall be final and not subject to the Disputes clause or otherwise subject to litigation under the Contract Disputes Act of 1978." 48 C.F.R. § 52.248–1(e)(3) (1984). Boards of contract appeals have uniformly refused to review the propriety of a VECP rejection. Ralph C. Nash, *Government Contract Changes* 9–33 (2d ed. 1989); *see* 2 John C. McBride, *Government Contracts* § 20.10[4] (1992). The dispute

in this case, however, does not concern the merits of plaintiff's proposal or the wisdom of accepting or rejecting it. The sole legitimate extent of the court's inquiry is whether the parties agreed on the terms of a VECP. If the CO accepted the VECP then that modification became a part of the contract. It could not then be removed without subsequent modification.

In *Derrick Electric Co. v. United States*, 220 Ct.Cl. 673, 618 F.2d 122 (1979), our predecessor court considered under the Wunderlich Act a board review of a CO's decision regarding acceptance of a VECP. The court held that the board's review was not improper inasmuch as the board did not examine the decision to reject the VECP on its merits, but instead determined whether the VECP had been accepted. *Derrick*, 220 Ct.Cl. at 676, 618 F.2d 122. The court held that the board had authority to determine whether the CO's actions regarding the proposal amounted to an acceptance of the VECP under the pertinent regulations and terms of the contract. *Id.* Just as in *Derrick*, the case at bar does not require the court to evaluate the CO's decision on the merits of the VECP. Our review here is limited to two questions: whether that which plaintiff proposed was a valid VECP within the terms of the applicable regulations and, if so, whether the CO accepted it. If the CO accepted a VECP, any subsequent contract disputes would be subject to the disputes clause. 2 McBride, *supra*, § 20.10[4]. If previously the CO had not accepted a VECP, then the subsequent rejection of plaintiff's proposal on April 7, 1989, was effective. Inasmuch as the court does have jurisdiction, we proceed to consider the merits of plaintiff's claim as challenged by defendant's motion for summary judgment.

### B. Summary Judgment

After adequate time for discovery and upon motion, Rule 56 mandates entry of judgment for defendant if plaintiff fails to make a showing sufficient to establish an element necessary for its recovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986);

*Siemens Aktiengesellschaft v. United States*, 26 Cl.Ct. 980, 984 (1992). As the party seeking summary judgment, defendant bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Godley v. United States*, 26 Cl.Ct. 1075, 1080 (1992). Inasmuch as Robin bears the burden of proof on its claim, the government may fulfill its responsibility by showing that there is an absence of evidence supporting some necessary element of the Robin's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554; *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987); *Young Enters. v. United States*, 26 Cl.Ct. 858, 862 (1992).

Once the movant has discharged its initial responsibility under Rule 56(c), the party opposing summary judgment must establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *YRT Servs. Corp. v. United States*, 28 Fed.Cl. 366, 383 (1993); *Eel River Sawmills, Inc. v. United States*, 27 Fed.Cl. 604, 607 (1993); *Durable Metals Prods., Inc. v. United States*, 27 Fed.Cl. 472, 477 (1993); *Godley*, 26 Cl.Ct. at 1080; *Young*, 26 Cl.Ct. at 862. It must designate specific facts showing that there is a genuine issue for trial, RCFC 56(f); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553, *Construction Equip. Lease Co. v. United States*, 26 Cl.Ct. 341, 345 (1992), and must show what specific evidence could be offered at trial. *Sweats*, 833 F.2d at 1562. The opponent must do more than show that there is some "metaphysical doubt" on an issue, *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, *Eel River*, 27 Fed.Cl. at 607, must present evidence that is more than merely colorable, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), and may not rely upon mere allegations and denials of the pleadings, RCFC 56(f); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Sweats*, 833 F.2d at

1562, or upon cryptic, conclusory, or generalized responses. *Durable*, 27 Fed.Cl. at 477; *Hawaiian Bitumuls & Paving v. United States*, 26 Cl.Ct. 1234, 1239 (1992). If the record as a whole could not lead a rational trier of fact to find for Robin, there is no genuine issue of material fact. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *Hawaiian*, 26 Cl.Ct. at 1239.

Defendant's proposed findings of fact are largely undisputed, and those that are disputed are unnecessary for the resolution of this matter. There is no genuine issue about the substance of the communications that passed between plaintiff and defendant regarding the VECP. The sole dispute is the legal significance of those communications. Summary judgment is therefore appropriate. *See Cedar Lumber, Inc. v. United States*, 857 F.2d 765, 769–70 (Fed.Cir.1988) (holding summary judgment appropriate where the only challenge the party opposing summary judgment raised to the moving party's proposed findings of facts was a dispute concerning the legal basis for employing certain calculations).

Plaintiff asserts that there is a triable issue as to whether the government accepted its VECP. However, it cannot point to any action or communication which alone, or in combination with other acts and communications, could support contract formation or might amount to acceptance of a VECP. Generalized assertions that the net result of these communications is greater than the sum of its parts are inadequate to overcome the undisputed evidence. Plaintiff is obliged, in responding to defendant's motion for summary judgment to "set forth specific facts showing that there is a genuine issue for trial." RCFC 56(f). As explained below, it has not done so.

Our initial inquiry is whether the contractor's proposal may be considered a VECP at all. A VECP is an incentive provision designed to induce the contractor to suggest changes that would lower the cost of performing under the contract. *W.R. Johnson, Inc.*, 91–3 B.C.A. (CCH) ¶ 24,172, at 120,913, 1991 WL 129845 (ASBCA July 2, 1991); 2 McBride, *supra,* § 20.10[1];

Nash, *supra*, at 9–1. It is thus used when the contractor proposes a contract modification that would result in a lower cost than he bid. If such a modification were proposed under the standard changes clause, the reduction in cost would effect a corresponding reduction in the contract price and a reduction in the contractor's profit. 2 McBride, *supra*, § 20.10[1]; Nash, *supra*, at 9–1. The VECP is thus a special purpose changes clause applicable only to contractor-initiated cost reduction proposals. Nash, *supra*, at 9–2.[5]

The applicable regulation specifies the legitimate form and content of a VECP:

"Value engineering change proposal (VECP)" means a proposal that—

(1) Requires a change to this, the instant contract, to implement; and

(2) Results in reducing the overall projected cost to the agency without impairing essential functions or characteristics; provided, that it does not involve a change—

(i) In deliverable end item quantities only;

(ii) In research and development (R & D) end items or R & D test quantities that is due solely to results of previous testing under this contract; or

(iii) To the contract type only.

48 C.F.R. § 52.248–1(b) (1984). One commentator has suggested that this clause "gives the contractor a broad scope within which legitimate value engineering proposals may be submitted." Nash, *supra*, at 9–34. Of concern here is that a VECP "results in reducing the overall projected cost to the agency." The applicable regulations do not define the phrase "overall projected cost to the agency."

The value engineering incentive clause does, however, explain in some detail the measure of the contractor's recovery. Under the regulations, when the government accepts a VECP the contractor shares in the "net acquisition savings" to the procuring entity. 48 C.F.R. § 52.248–1(f). "Net acquisition savings" is defined as "total acquisition savings, including instant, concurrent, and future contract savings, less Government costs." 48 C.F.R. § 52.248–1(b). "Acquisitions savings" means "savings resulting from the application of a VECP to contracts awarded by the same contracting office or its successor ... for essentially the same unit," including "instant contract savings," "concurrent contract savings," and "future contract savings." *Id.* "Instant contract savings" is defined in terms of "instant unit cost reduction." *Id.* "Future contract savings" is defined in terms of "future unit cost reduction," which in turn is defined in terms of "instant unit cost reduction." *Id.* "Instant unit cost reduction" is defined as "the amount of the decrease in unit cost of performance." *Id.* "Concurrent contract savings" are defined as "measurable net reductions in the prices of other contracts that are definitized and ongoing at the time the VECP is accepted."[6] *Id.*

■ Plaintiff's proposal of October 23, 1987, even if accepted, would not have constituted a VECP under this regulatory framework. Plaintiff proposed no decrease in the "unit cost of performance" on the contract and, thus, no "instant unit cost reduction." The proposal therefore could not have produced "instant contract savings" or "future contract savings." The only other contract that this proposal may have affected was the supplemental order for 30,000 additional gaskets from the same supplier. Because the proposal, even

---

5. Government contracts may incorporate one of two types of value engineering clauses: incentive provisions and program requirements. 2 McBride, *supra*, § 20.10, .20, .30; Nash, *supra*, at 9–2. In program requirement value engineering clauses, value engineering is a mandatory, separately priced segment of the contract work. 2 McBride, *supra*, § 20.20; Nash, *supra*, at 9–2. Under incentive provisions, the contractor is permitted, but not required, to suggest alterna-

tives. 2 McBride, *supra*, § 20.30; Nash, *supra*, at 9–2. In exchange for suggesting alternatives, the contractor shares in the benefits received. The value engineering proposal in this contract was of the incentive type.

6. The only other type of savings are "collateral savings," which have not been claimed here.

if accepted, would not have reduced the unit price of that contract, it produced no "concurrent contract savings."

To understand why the proposal was an RFD and not a VECP, it is helpful to consider exactly what the contractor proposed. The contractor suggested using a certain material it had developed. Had the material met the requirements of the specification on which the contractor bid, there would have been no need to submit a VECP/RFD; the contractor could have simply used the new material. However, the material did not meet the contract specifications. The contractor therefore proposed changing the specification. In particular, the contractor suggested that the maximum permissible TMR be increased from 10 to 50, that the immersion resistance requirement be changed, that "low temp. comp. set" and "compression set" both be modified, and that a new test called "low temperature brittleness" be employed. Still, the gist of the contractor's proposal was to make the gaskets of its new material.

On the instant contract, the proposal would have saved the agency no money when measured against the contract price. The cost of producing a gasket using the material suggested in the VECP would have been about sixty-eight cents each, an amount over fifty percent higher than the contractor's bid. Indeed, the contractor's letter of April 28, 1988, refers to the "increased cost of materials and processing."

The contractor refused to accept various contract modifications that the government proposed which would have allowed it to receive sixty-eight cents per gasket on this contract. Instead, the contractor insisted that it should share in future savings by receiving part of the difference between what it would cost to produce gaskets using the new material and what it would have cost using the material suggested in the contract, i.e., the difference between the actual cost and what the contractor should have bid, instead of the difference between the actual cost and what the contractor did bid.

In substance, the contractor made such a low initial bid that it left itself no room in which to engage in value engineering. It could not develop an acceptable alternative that would allow it to perform at a cost lower than its bid. The government is entitled to receive the benefit of its bargain, however, even though the contractor substantially underbid the contract.

The change the contractor proposed was thus not a VECP at all. The contractor's proposal would not have resulted in a cost of performance lower than its bid. The government would have gotten less and paid more under plaintiff's proposal. The change proposed by the contractor was a legitimate RFD, but it was not a VECP. Even when viewed from the perspective of what the government ultimately permitted, the result is the same. The changes that the government accepted did not constitute a VECP. They were merely a deviation from the original contract requirements. The government permitted performance under new, less demanding specifications, but received no commensurate reduction in price. In short, neither plaintiff's proposal nor the deviations that the government accepted could constitute a VECP.

■ Even assuming, arguendo, that plaintiff's proposal of October 23, 1987, was a VECP, the government never accepted it. The parties' actions make plain that they reached no mutual understanding. The value engineering clause specifies how the CO may accept a VECP:

Any VECP may be accepted, in whole or in part, by the Contracting Officer's award of a modification to this contract citing this clause and made either before or within a reasonable time after contract performance is completed. Until such a contract modification applies a VECP to this contract, the Contractor shall perform in accordance with the existing contract.

48 C.F.R. § 52.248–1(e)(3) (1984).

A CO therefore accepts a VECP by awarding a contract modification. No such modification was ever awarded here. In its complaint plaintiff alleges that "DISC accepted Plaintiff's VECP on or about May

13, 1988," apparently referring to the mailgram of May 13, 1988. This document cannot be interpreted as a contract modification with respect to the VECP, however. The only reasonable interpretation of this mailgram is that it refers to the contractor's RFD. Nothing in it refers to the VECP.[7] Nor could the agency's internal discussions about whether to accept a VECP amount to an actual acceptance of a VECP, because they were never communicated to plaintiff. This same analysis applies to the interoffice memorandum of August 16, 1988, in which Walter Szychulski suggested that the contract be modified to show acceptance of the VECP. Until the contract was so modified, the VECP had not been accepted.

Neither do unexecuted proposed modifications constitute acceptance of a VECP. On August 23, 1988, DISC sent an unsigned contract modification to Robin. In an enclosed letter, DISC explained that the modification would only become effective when signed by plaintiff, submitted to DISC, and approved by DISC. This unsigned document, under this cover letter, cannot reasonably be construed as award of a modification or acceptance of plaintiff's VECP. Plainly, the government would accept the VECP only if Robin acceded to the other terms of the proposed modification. Mere tender of a contract modification is not clear evidence of acceptance of a VECP; a VECP is accepted by "award of a modification to th[e] contract citing [the value engineering] clause." 48 C.F.R. § 52.248–1(e)(3). Whether this communication was an offer to accept a VECP under these additional terms or merely an invitation for an offer is immaterial. Plaintiff refused to sign the proposed modification.

■ Although not explicitly raised by plaintiff, the court notes that a contractor makes a prima facie case that the government has constructively accepted a VECP when it shows that the government issued a modification incorporating substantially all the changes proposed. *American Standard, Inc.*, 72–1 B.C.A. (CCH) ¶ 9433, 1972 WL 1088 (DOTCAB, Apr. 14, 1972); *Thompson Aircraft Tire Corp.*, 71–2 B.C.A. (CCH) ¶ 8981, 1971 WL 1256 (ASBCA, July 9, 1972); Nash, *supra*, at 9–32. Two actions by the government effected changes concerning the subject described in the contractor's proposal. Neither, however, amounts to constructive acceptance of a VECP. The first action was government acceptance of gaskets the contractor produced under the instant contract. As discussed above, permitting plaintiff to meet lower requirements under these circumstances without a corresponding reduction in price does not imply the existence or acceptance of a VECP. In essence, the government accepted plaintiff's RFD with respect to the gaskets tendered.

The government's second action was to change its specification to create two classes of Type III gaskets: class 1 had to function down to $-40°F$, while class 2 had to function down to $-60°F$. The government would test each class over its range of operation. However, these changes did not comport with the modifications plaintiff proposed in its VECP/RFD. Plaintiff proposed changing the specification to conform to the description of the new material it had developed. The government instead adopted a different change that it had developed independently of the contractor's input. Of course, that the government or another contractor previously conceived of an idea later incorporated in a VECP is not necessarily a bar to the proposal's acceptability. *John J. Kirlin, Inc. v. United States*, 827 F.2d 1538, 1541 (Fed.Cir.1987); *see, e.g., B.F. Goodrich Co. v. United States*, 185 Ct.Cl. 14, 20–22, 398 F.2d 843,

---

7. The May 13, 1988, mailgram was a response to the letter of April 28, 1988, which in turn was a response to the mailgram of April 13, 1988, explicitly referring to the contractor's RFD. Neither the April 13 mailgram nor the April 28 letter mentioned the VECP. The April 28 letter demanded "unqualified approval as to the material properties of the compound we have proposed," but nothing in this language suggests that the contractor was inquiring as to the VECP instead of the RFD. At most, the mailgram of May 13, 1988, was a confirmation of the April 13, 1988, mailgram indicating that Robin's RFD would be approved.

**132**

847–48 (1968); *Syro Steel Co.*, 69–2 B.C.A. (CCH) ¶ 8046, at 37,369, 1969 WL 797 (ASBCA, Dec. 10, 1969); *but see Tennier Indus., Inc.*, 86–3 B.C.A. ¶ 19,046, 1986 WL 20001 (ASBCA, May 2, 1986); Nash, *supra,* at 9–30. However, where the government implements a change different from that recommended by the contractor and developed independently of the contractor's VECP, there is no legal basis for the contractor to receive compensation.

With respect to later contracts, whether between the government and this contractor or other contractors, no obligation to pay on a VECP arose. The Federal Circuit has held that a contractor whose proposal was rejected in one contract may not be awarded compensation based on the use of a similar idea in a subsequent contract to which he was not a party. *Kirlin,* 827 F.2d at 1541. This decision has been criticized by some commentators as contrary to the spirit of the value engineering clause. Nash, *supra,* at 9–32 to –33. Such criticism need not concern us here, because the contractor has neither alleged nor offered any evidence to show that later contracts incorporated the ideas of its proposal. As discussed above, the government's new specifications differed from the specifications proposed by the contractor.

CONCLUSION

Although the court has jurisdiction over this claim, at least with respect to articles delivered under contract before the complaint was filed, the defendant has shown that no genuine issue of material fact exists as to the acceptance of the contractor's VECP and that it is entitled to judgment as a matter of law. Even assuming plaintiff's proposal could be treated as a VECP, the government did not accept it, either actually or constructively. The Clerk is directed to dismiss the complaint with prejudice. No costs.